Jeffrey L. LAGUD, Respondent,

v.

KANSAS CITY BOARD OF POLICE
COMMISSIONERS, Appellant.

No. SC 85627.

Supreme Court of Missouri,
En Banc.

June 22, 2004.

Dale H. Close, Kansas City, MO, for Appellant.

Steve A.J. Bukaty, Overland Park, KS, for Respondent.

LAURA DENVIR STITH, Judge.

The Kansas City Board of Police Commissioners (the Board) found that Officer Jeffrey Lagud violated department policy

by touching the penis of an arrestee while collecting a urine sample and by being untruthful in his testimony before the Board and during the investigation of the incident. As a result, the Board suspended Officer Lagud without pay for nearly eight months. Officer Lagud alleges that the Board should have stricken the testimony of Mr. Russell, the alleged victim, because his invocation of the Fifth Amendment on cross-examination improperly precluded Officer Lagud from testing his capacity to perceive and recall what occurred during collection of the sample.

This Court agrees that Mr. Russell's invocation of the Fifth Amendment on cross-examination precluded inquiry into his competence to observe and recall the events about which he testified on direct examination. The precluded testimony was both relevant and material, rather than merely collateral or impeachment evidence, and was non-cumulative. In this circumstance, the Board erred in failing to grant Officer Lagud's motion to strike Mr. Russell's testimony about the incident. Inasmuch as the Board relied primarily on the testimony of Mr. Russell and Officer Carmody in reaching its decision, the failure to strike Mr. Russell's testimony was prejudicial. The circuit court's judgment is reversed, and this Court remands the case so that the circuit court may remand to the Board for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

The witnesses and evidence at the hearing before the Board showed the following.

On the night of September 10, 2000, Officer James Carmody and his partner noticed James Russell sitting behind the steering wheel of his car in the parking lot of a Kansas City nightclub. The keys were in the ignition, and the engine was running. Mr. Russell appeared to be unconscious, and his body was leaning out of the open driver's-side door. The officers roused him and asked him to exit the vehicle for a field sobriety test. The police report prepared by Officer Carmody's partner said that Mr. Russell was so impaired that he fell when trying to get out of his car, but Officer Carmody testified at the hearing that he had helped Mr. Russell exit the car without falling.

Officer Carmody's partner found Ecstasy when he searched Mr. Russell. The officers also found various drugs, including steroids, more Ecstasy, and gamma hydroxy butyrate (GHB), the "date-rape" drug, in Mr. Russell's car. They arrested him and brought him to the police station. Mr. Russell at some point informed Officer Carmody and his partner that he had taken GHB, which in high doses can cause unconsciousness, memory loss, and coma.[1] The officers then obtained the assistance of Officer Lagud and another drug recognition and evaluation officer to conduct a series of tests on Mr. Russell. As a safety precaution, the officers kept the hands of Mr. Russell, a six-foot, 240–pound body builder, handcuffed behind his back due to his erratic behavior, which vacillated between unconsciousness and agitation.[2]

---

1. *See* DEA Briefs & Background, Drugs & Drug Abuse, Drug Descriptions, GHB, *available at* http://www.usdoj.gov/dea/concern/ghbp.html (last visited Apr. 13, 2004). *See* NAT'L DRUG INTELLIGENCE CTR., U.S. DEP'T OF JUSTICE, *GHB Analogs*, INFO. BULL. (Aug.2002), *available at* http://www.usdoj.gov/ndic/pubs1/1621/1621p.pdf. Known as a "date-rape" drug, GHB was recently classi-

fied as a Schedule I controlled substance. *See* Hillory J. Farias & Samantha Reid Date–Rape Drug Prohibition Act of 2000, Pub.L. No. 106–172, 2000 U.S.C.C.A.N. (114 Stat. 7–8) secs. 2, 3(a) (to be codified at 21 U.S.C. sec. 812 note); *sec.* 195.017, RSMo Supp.2003.

2. *See* Farias & Reid, *supra* note 1, at sec. 2(3) (stating "aggression and violence can be ex-

A breathalyzer test was negative for alcohol. According to the officers, they then obtained Mr. Russell's consent to test his urine for drugs. Officers Carmody and Lagud then escorted Mr. Russell to a small, partially enclosed urinal in the holding cell. Officer Carmody stood behind Mr. Russell, whose hands were still cuffed behind his back, and held the handcuffs to keep Mr. Russell from falling.

Accounts differ as to what happened next. According to Officer Lagud, he unfastened and pulled down Mr. Russell's pants and underwear, and collected the sample by then holding the sample cup in front of Mr. Russell and instructing him to begin urinating. He then pulled Mr. Russell's underwear back up, all without touching Mr. Russell's penis.

Officer Carmody described the event differently when he mentioned it to his supervisor a couple of days later, as they were lifting weights. He said that Officer Lagud had held Mr. Russell's penis while collecting the urine sample. An internal affairs investigation ensued. Officer Carmody told the investigator that, in addition to seeing Officer Lagud hold Mr. Russell's penis while collecting the sample, he had actually seen Officer Lagud unzip and unbutton Mr. Russell's pants, reach into the waistband of Mr. Russell's underwear, and remove his penis. Officers Lagud and Carmody both subsequently took polygraph tests; neither polygrapher found his test subject had lied.

Based on the investigation, Chief of Police Richard Easley filed charges and specifications with the Board, charging Officer Lagud with misconduct in violating department policy[3] by "obtain[ing] a urine sample by grabbing and holding the penis of the arrest[ee]" and by then denying he had done so.

On April 16, 2001, the Board held a hearing pursuant to section 84.610.[4] During the hearing Officer Lagud testified consistently with his prior statements. Officer Carmody retracted his prior claims that he saw Officer Lagud actually unbutton and unzip Mr. Russell's pants, reach into his underwear, and remove his penis.

---

pected in some individuals who use such drug").

**3.** The policy that Officer Lagud allegedly violated is Personnel Policy 201–7, which provides various "Rules of Conduct," including the following:

15. A member will not engage in, or attempt to engage in, or knowingly consent to any form of dishonesty, including deviations from the truth, whether on or off duty.

. . . .

59. Members ... shall not engage in any conduct or commit any disorder or neglect to the prejudice of good order and discipline of the department, or engage in any conduct of a nature to bring discredit upon the member or the department, or engage in any conduct unbecoming of a member of the department. Conduct unbecoming a member of the department shall include any conduct which adversely affects the morale or efficiency of the department and any conduct which has a tendency to adversely affect, lower, or destroy public respect and confidence in the department or its members.

60. Members are further charged with the duty to conduct themselves at all times in keeping with the Code of Ethics and the policy statements of the Chief of Police; all activity contrary to this concept, whether or not specifically mentioned or prohibited in these rules, may subject members to disciplinary action.

Personnel Policy 201–7 (1999). Although the department now has a specific policy regarding appropriate contact with arrestees when obtaining urine samples, no such policy was in place at the time of Mr. Russell's arrest. Although he did so below, Officer Lagud does not raise any issue in this Court about the alleged vagueness of this policy's application to his conduct.

**4.** All statutory references are to RSMo 2000, unless otherwise indicated.

Instead, Officer Carmody claimed that, after Mr. Russell's penis was exposed and Officer Lagud instructed Mr. Russell to begin urinating, he saw Officer Lagud hold Mr. Russell's penis in his left hand while Mr. Russell urinated into the sample cup held in Officer Lagud's right hand, shake Mr. Russell's penis and place it back in his underwear.

Mr. Russell's testimony differed somewhat from that of either officer. He said that he was simply sleeping in his car when officers tapped on the window and asked him to exit the car. He said that the engine was not running when the officers found him and that he got out of the car without falling. He then answered the officers' questions and was patted down for weapons. He said he objected to being searched and to having the car searched, but both were searched nonetheless, and drugs, including GHB, were found in the vehicle. He admits he was subsequently arrested by Officer Carmody and taken to a police station. At the station, he said, he remained handcuffed and took a breathalyzer test, which was negative for alcohol. He stated he was then told to give a urine sample, and, while he did not give permission for the urinalysis, he gave the sample when instructed to do so.

When asked at the hearing to identify the man who took the urine sample and allegedly touched his penis, Mr. Russell was unable to identify Officer Lagud. In fact, he identified one of the attorneys sitting with Officer Lagud at the counsel table as the officer who had touched his penis. When subsequently asked if he was, in fact, not able to identify who took the sample, he admitted this was true but stated he remembered the sample being taken. He was unable to give a description of the appearance of the officer who took the sample. He further incorrectly identified the police station where the sample had been taken. And, he agreed that he had not mentioned the touching until after he was approached by police investigating Officer Carmody's allegations. But, at the hearing, he nonetheless testified that during the sampling process Officer Carmody was behind him and the other officer touched his penis.

As discussed *infra*, Mr. Russell then invoked the Fifth Amendment and refused to answer questions about his drug use or his ability to perceive on the night in question. The Board ruled that Mr. Russell's drug use was irrelevant, foreclosed further cross-examination on this topic, and refused Officer Lagud's motion to strike Mr. Russell's testimony or to presume that his cognition was impaired at the time of his arrest based on his refusal to testify. Later during cross-examination, however, Mr. Russell volunteered in response to an unrelated question that he "didn't think there was anything in [his] system that would make a difference" and denied being "under the influence of drugs at [the] time" of his arrest. Nevertheless, the Board refused to change its prior rulings regarding cross-examination on Mr. Russell's drug use or striking his testimony. Instead, it found Officer Lagud's account not to be credible, concluded that he violated departmental policy, and suspended him without pay for nearly eight months. It said in so ruling it relied "primarily" on the testimony of Mr. Russell and of Officer Carmody.

Officer Lagud appealed, and the circuit court reversed the Board's decision. The Board then appealed. Following opinion by the Court of Appeals, Western District, this Court granted transfer. *Mo. Const. art. V, sec. 10.*

## II. Standard of Review

Article V, section 18, of the Missouri Constitution provides for judicial review of

administrative actions to determine "whether [such agency actions] are authorized by law, and in cases in which a hearing is required by law, whether the same are *supported by competent and substantial evidence upon the whole record.*" *Mo. Const. art. V, sec. 18* (emphasis added). Consistent with the constitutional standard, section 536.140.2 provides for appellate review of the administrative ruling, not that of the circuit court, to determine whether the administrative action:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

*Sec.* 536.140.2. Officer Lagud relies on subdivision (3), arguing that the Board's decision "is unsupported by competent and substantial evidence upon the whole record." He and the Board both state that, in applying this provision, this Court is to consider the evidence in the light most favorable to the Board's decision.

■ But, in *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220 (Mo. banc 2003), in construing the same constitutional provision (article V, section 18) and in apply-

ing a statute that directed this Court to determine whether there was "sufficient competent evidence in the record to warrant the making of the award," *sec.* 287.495.1(4), this Court held:

There is nothing in the constitution or section 287.495.1 that requires a reviewing court to view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the [agency's decision].

*Id.* at 223. The Court then stated that, absent this inference, a reviewing court should simply decide:

whether, considering the whole record, there is sufficient competent and substantial evidence to support the [agency's decision]. This standard would not be met in the rare case when the [agency's decision] is contrary to the overwhelming weight of the evidence.

*Id.* This reasoning applies here. This Court must look to the whole record in reviewing the Board's decision, not merely at that evidence that supports its decision. To the extent prior cases instruct that on appeal the evidence should be viewed in the light most favorable to the decision of the agency, they should no longer be followed.[5]

## III. ANALYSIS

■ Officer Lagud argues that Mr. Russell's testimony about the incident before the Board should have been stricken because of his invocation of the Fifth Amendment. He argues that the claim of privilege precluded him from showing that Mr.

5. *See, e.g., Graves v. City of Joplin,* 48 S.W.3d 121, 124 (Mo.App. S.D.2001); *Jones v. City of Jennings,* 23 S.W.3d 801, 803 (Mo.App. E.D. 2000); *Curtis v. Bd. of Police Comm'rs of Kansas City,* 841 S.W.2d 259, 261 (Mo.App. W.D.1992). This does not mean that this Court will redetermine the issues on appeal. It merely means that, as the constitution re-

quires, this Court will look at the entire record, not just those parts of it supporting the ruling, to determine whether it is supported by competent and substantial evidence upon the whole record. If so, the ruling will be affirmed, even though the evidence would also have supported a contrary determination.

Russell was incompetent to testify about what happened because he was so impaired by drugs at the time of his arrest that he could not accurately perceive what occurred. Therefore, the Board erred in failing to strike Mr. Russell's testimony once Mr. Russell took the Fifth Amendment. He further argues that absent this evidence, it was just his word against Officer Carmody's changing and inconsistent testimony, and in that circumstance the Board would have decided in his favor.

█ In refusing to strike and in instead relying on the testimony of Mr. Russell, the Board erred. The Board conducted its hearing pursuant to section 84.610. Although the technical rules of evidence are not applicable, the fundamental rules of evidence applicable in civil cases apply to such administrative hearings. *State Bd. of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 153–55 (Mo. banc 2003). Further, the hearing was subject to section 536.070(2), which provides, in pertinent part: "Each party shall have the right ... to cross-examine opposing witnesses on any matter relevant to the issues even though that matter was not the subject of the direct examination...." *Sec.* 536.070(2); *Wheeler v. Bd. of Police Comm'rs of Kansas City*, 918 S.W.2d 800, 804 (Mo.App. W.D.1996).

█ Of course, the fact that the party subject to discipline has the right to cross-examination cannot take from the witness the right to claim his or her Fifth Amendment privilege against self-incrimination in a civil, administrative, or criminal case.[6] The privilege can be waived, however, as, for example, if the witness admits some incriminating matters about a particular event, but then claims the privilege when asked to explain further details. *See Rogers v. United States*, 340 U.S. 367, 371–73, 71 S.Ct. 438, 95 L.Ed. 344 (1951) (stating that "[t]o uphold a claim of privilege [after petitioner voluntarily testified to facts tending to incriminate her] would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony"). *See also, State ex rel. Lee v. Cavanaugh*, 419 S.W.2d 929, 936 (Mo.App. K.C.1967) (accord). The parties disagree whether this exception is applicable here. But, assuming for present purposes that Mr. Russell's right to assert the privilege was not waived by his earlier admissions regarding drug possession,[7] and that the Board therefore did not err in recognizing his assertion of it and in precluding further cross-examination about his drug use on the night of his arrest, the parties strongly disagree as to what, if any, effect Mr. Russell's invocation of the Fifth Amend-

6. While the Fifth Amendment is framed in terms of criminal proceedings, this Court has held that "[a] witness' privilege against self-incrimination '... also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 768 (Mo. banc 1987), *quoting, Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). *See also, sec.* 536.070(8) (stating "[t]he rules of privilege shall be effective to the same extent that they are now or may hereafter be in civil actions"); *Gamble v. Hoffman*, 732 S.W.2d 890, 894 (Mo. banc 1987) (accord, citing section 536.070); *Johnson v. Mo. Bd. of Nursing Adm'r*, 130 S.W.3d 619, 628–32 (Mo.App. W.D.2004) (noting the privilege applies in administrative cases and discussing various available remedies when a witness or party invokes the privilege); *Williams v. Gary Breedlove Constr., Co.*, 950 S.W.2d 557, 561–62 (Mo.App. S.D.1997) (addressing, in a contested administrative proceeding, the proper remedy for the claimant's assertion of the privilege during a deposition and again on cross-examination).

7. This is an issue that the Court does not address.

ment should have had on the weight given or admissibility of his testimony.

▪ The Board asserts that it properly gave Mr. Russell's invocation of the privilege no effect because Mr. Russell's drug use on the evening of his arrest was irrelevant. Alternatively, the Board avers, even if Mr. Russell's drug use were relevant, Officer Lagud asked only a single question as to whether Mr. Russell had used drugs that night and any answer Mr. Russell might have given would have been cumulative to the other evidence of his drug use. Thus, the Board suggests, Officer Lagud suffered no prejudice.

This Court disagrees. Examination of the record reveals that when Mr. Russell was asked on cross-examination, "Were you taking GHB on the night of September 10, 2000?," counsel for Police Chief Easley objected, claiming that this was not relevant and that, by answering, Mr. Russell could incriminate himself, as a driving under the influence charge was still pending against him. The Board advised Mr. Russell of his right against self-incrimination, and he then claimed the Fifth Amendment and refused to answer. The Board foreclosed any further questions regarding the extent of Mr. Russell's drug use on the night in question or its effect on his ability to recall the events of that evening, including the sample collection, by directing counsel for Officer Lagud to "stop any further questioning in this regard." The Board refused to alter its rulings regarding cross-examination on Mr. Russell's drug use even after he subsequently denied being under the influence of drugs on the evening of his arrest.

▪ While administrative hearing officers in contested cases have "wide discretion in determining the scope of cross-examination," *Mueller v. Ruddy*, 617 S.W.2d 466, 478 (Mo.App. E.D.1981), this discretion does not extend to excluding testimony on relevant and material issues sought to be evoked on cross-examination. *See Rogers v. St. Avit*, 60 S.W.2d 698, 700 (Mo.App.St.L.1933). *See also, Merk v. St. Louis Pub. Serv. Co.*, 299 S.W.2d 446, 449 (Mo.1957) (stating there is "no discretion to prevent any cross-examination at all on a proper subject"). In fact:

> It has long been the rule in Missouri that on cross-examination a witness may be asked any questions which tend to test his accuracy, veracity or credibility or to shake his credit by injuring his character. He may be compelled to answer any such question ..., except where the answer might expose him to a criminal charge.

*Sandy Ford Ranch, Inc. v. Dill*, 449 S.W.2d 1, 6 (Mo.1970).

▪ Mr. Russell's responses to the precluded line of questioning would have been non-cumulative, relevant, and material. Despite the officers' testimony and the admission of various police reports stating Mr. Russell was under the influence of GHB on the night of his arrest, his responses to the foreclosed area of examination would have been non-cumulative as Mr. Russell specifically denied being under the influence of drugs at the time of his arrest in response to an unrelated question on cross-examination after previously invoking the Fifth Amendment. Furthermore, where, as here, the matter about which inquiry was precluded is not simply a collaterally relevant issue or one going to impeachment—although Mr. Russell's drug use was relevant impeachment evidence—but also goes to his very capacity and competence as a witness to perceive, for:

> 'It is widely recognized that evidence of an intoxicated condition at the time of the matters about which the witness has testified is admissible to affect the credi-

bility of his testimony, such evidence being properly elicited either by the independent testimony of another witness, or by cross-examination of the witness sought to be impeached. Although some of the courts applying this principle are unwilling to let the introduction of such testimony be denominated technically as 'impeachment,' the practical effect of its application is the same, as is its underlying rationale, which is that *it is always proper to show matters affecting the condition of the witness at the time of the matters testified to, as affecting his ability to observe or recollect them.'*

*The foregoing is the rule in Missouri....*

*The intoxication of a witness as of the time the events took place which are the subject of the witness's testimony is not a collateral issue but bears directly upon the ability of the witness to accurately describe those events.*

*State v. Caston*, 509 S.W.2d 39, 41 (Mo. 1974) (citations omitted) (emphasis added). *See Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 106 (Mo. banc 1996) (stating, in a civil case, that "evidence of alcohol consumption 'is relevant and material to the witness's ability to see, hear, perceive and observe,'" that such "evidence is admissible by cross-examination or by independent testimony," and that "[a]ny possible impairment of a witness's ability to recall is relevant to her credibility," and

holding that it was error for the trial court to bar such evidence (citations omitted)).

Here, the very drug that Mr. Russell admitted to having taken, GHB, is known to alter the user's ability to perceive and recall, *see* note 1, *supra,* and numerous other drugs were in his possession. The officers testified that he exhibited erratic behavior and was significantly impaired and even incoherent just before the urine sample was taken. It is beyond cavil that his drug use was relevant not just to impeach his credibility, but also to assist the Board in judging his ability to perceive what was occurring when the sample was taken. The Board erred in holding to the contrary.

A range of remedies has been approved, in varying circumstances, as appropriate to negate the otherwise prejudicial effect of a witness' invocation of the Fifth Amendment privilege, ranging from permitting the fact finder to infer that the witness' answer might tend to incriminate him,[8] to a continuance, to striking all or part of the witness' testimony.[9] In this case, Officer Lagud alleges that the Board should have stricken Mr. Russell's testimony about the taking of the urine sample. This Court discussed how to determine when it is proper to strike a witness' testimony in *State v. Brown*, 549 S.W.2d 336 (Mo. banc 1977):

'In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross-

---

8. *McKelvey*, 733 S.W.2d at 768; *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (allowing such adverse inferences in civil cases).

9. *See Williams*, 950 S.W.2d at 561–63 (noting, in an administrative case, that "[t]he ALJ had discretion to fashion appropriate relief in response to [claimant's] assertion of the privilege," but holding that, under the circumstances, it was not necessary to strike the claimant's testimony and claim where the in-

equity caused by assertion of the privilege could be cured by a continuation for additional discovery as the claimant agreed to waive the privilege); *Harwell v. Harwell*, 355 S.W.2d 137, 141 (Mo.App.K.C.1962) (quoting 98 C.J.S. Witnesses section 455 for various remedies, which, *inter alia*, include striking the testimony given on direct examination where the witness refuses to answer pertinent questions on cross-examination).

examination may be used against the defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination.'

*Id.* at 342, *quoting, United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.1963). *Brown* continued:

'Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him … *On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part.*'

*Id., quoting, Cardillo,* 316 F.2d at 611 (citations omitted) (emphasis added).[10]

*Brown* then suggested that most situations in which the privilege is invoked can be placed into one of three categories:

'The *first* would be one in which the answer would have been so closely related to the commission of the crime that the entire testimony of the witness should be stricken. The *second* would be a situation in which the subject matter of the testimony was connected solely with one phase of the case in which event a partial striking might suffice. The *third* would involve collateral matters or cumulative testimony concerning

credibility which would not require a direction to strike and which could be handled (in a jury case) by the judge's charge if questions as to the weight to be ascribed to such testimony arose. As to the first and second categories suggested, whether all or a part of the testimony should be stricken, must depend upon the discretion of the trial judge exercised in the light of the particular circumstances.'

*Id.* at 343, *quoting, Cardillo,* 316 F.2d at 613 (emphasis added).

The analysis in *Brown* is fully applicable to this administrative proceeding. The disallowed line of questioning was relevant and material, was non-cumulative, and went specifically to Mr. Russell's ability to perceive and recall what occurred during collection of the sample rather than a collateral matter. Particularly given his subsequent denial of drug use on the night of his arrest, his invocation of the Fifth Amendment substantially prejudiced Officer Lagud's defense. Consequently, the Board erred in failing to grant counsel's request to strike Mr. Russell's testimony as to the events on the night of his arrest as to which his competence is in question due to his alleged drug use.

Moreover, this Court cannot say that the error did not affect the Board's decision, for the Board specifically stated in its findings of fact that it "primarily relied on the testimony of [Officer] Carmody and [Mr.] Russell" in concluding that Officer Lagud touched Mr. Russell's penis and violated department policy. Without Mr. Russell's testimony about the sample collection, the Board would simply have had to weigh Officer Carmody's testimony against Officer Lagud's.

Officer Lagud claims that Officer Carmody's testimony, too, is completely unre-

---

**10.** In *Brown,* however, this Court limited discretion to impose the remedy of striking testimony in criminal cases where a defendant's right to call witnesses in his defense would be impinged. *Id.* at 346.

liable, not because of any invocation of privilege, but because his testimony was so inconsistent as to be neither credible nor constitute substantial evidence, and that this leaves no basis for the decision to suspend Officer Lagud. Among other inconsistencies, Officer Lagud points to the changes in Officer Carmody's testimony on the central factual issue whether he touched Mr. Russell's penis.[11] During the investigation, Officer Carmody claimed to have actually seen Officer Lagud unbutton and unzip Mr. Russell's pants, reach into his waistband, and remove his penis, in addition to holding Mr. Russell's penis during the sample collection. But, before the Board, he testified that his prior statements were merely based on his assumption that this is what Officer Lagud must have done to expose Mr. Russell's penis in order to get the sample, and that he did not actually observe Officer Lagud expose Mr. Russell's penis.

■ "It is well-settled in Missouri that the contradictory testimony of a single witness relied on to prove a particular fact does not constitute substantial evidence and is not probative of that fact in the absence of an explanation or other circumstances tending to explain the contradiction." *Yoos v. Jewish Hosp. of St. Louis,* 645 S.W.2d 177, 185 (Mo.App. E.D. 1982) (citation omitted). *See also, Baker v. Guzon,* 950 S.W.2d 635, 646 (Mo.App. E.D. 1997) (accord). And, if the witness' testimony is not so inconsistent as to be inherently self-contradictory, the finder of fact must still consider the testimony as a whole in reaching its determination. *Odum v. Cejas,* 510 S.W.2d 218, 223–25 (Mo.App.Spr.1974). But, as it has previously been held in the context of a work-

ers' compensation proceeding, where testimony at a hearing is simply inconsistent with prior statements, the prior statements are admissible for impeachment, and "[i]t is the function of the ... [c]ommission to pass on the credibility of the witnesses and the weight to be given the evidence." *See, e.g., Cain v. Orscheln Bros. Truck Lines, Inc.,* 450 S.W.2d 474, 478 (Mo.App.K.C.1970).

The Board has not had the opportunity to consider Officer Carmody's remarks and the credibility or lack of credibility that they should be given absent the corroborative effect of Mr. Russell's testimony. Accordingly, this Court believes it is inappropriate to determine whether his testimony was so inherently contradictory as to be insufficient to support a finding against Officer Lagud.

## IV. CONCLUSION

Because the testimony of one of the two witnesses upon which the Board primarily relied concerning the taking of the urine sample should have been stricken, and the failure to do so prejudiced Officer Lagud, this Court reverses the circuit court's judgment and remands the case so that the circuit court may remand to the Board for further proceedings consistent with this opinion.

WHITE, C.J., WOLFF, BENTON, TEITELMAN and LIMBAUGH, JJ., and VAN AMBURG, Sp.J., concur.

PRICE, J., not participating.

---

11. Additional statements by Officer Carmody that Officer Lagud cites as inconsistent with other evidence in the record include Officer Carmody's testimony that he helped Mr. Russell exit his vehicle without falling, which is contradicted by the DUI information sheet filled out by Officer Lagud and the arrest report completed by Officer Carmody's partner, and that he saw Officer Lagud shake Mr. Russell's penis after the urine sample was given, which Mr. Russell denied in his testimony.