**Yolanda R. MILLER, Appellant,**

v.

**Richard DUNN, Director, Missouri Department of Health and Senior Services, Respondent.**

**No. ED 86297.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Feb. 14, 2006.

Vincent G. Rapp, Vincent G. Rapp, LLC, St. Charles, MO, for Appellant.

Kelly D. Walker, General Counsel, Jeremiah W. (Jay) Nixon, Atty. Gen., Kathleen A. Fitzgerald, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY M. GAERTNER, SR., Presiding Judge.

Appellant, Yolanda R. Miller ("Miller"), appeals the judgment of the Circuit Court of St. Louis County affirming the decision of Respondent, Richard Dunn, Director, Missouri Department of Health and Senior Services ("the Department"). The Department's decision ordered Miller's name to be permanently placed on the Employee Disqualification List ("the EDL") because there was competent and substantial evidence that Miller, a nurse, misappropriated $15,000.00 from Martha Whitaker ("Whitaker"), a resident at a nursing home. We affirm.

Miller worked as a certified nursing assistant/licensed practical nurse part-time at Friendship Village of West County ("Friendship Village"), a nursing home in Chesterfield, Missouri. Whitaker was a resident at the long-term care unit at Friendship Village from March 4, 2002 until her death on June 24, 2003. As part of her nursing duties, Miller worked directly with Whitaker approximately eleven times prior to May 22, 2003. As one of Whitaker's nurses, Miller was aware of Whitaker's diagnoses and medications.

While at Friendship Village, Whitaker was treated for the following conditions: dementia, major depressive disorder, anxiety (severe at times), obsessive-compulsive disorder traits, periods of delirium, depression, acute respiratory failure, anemia, chronic obstructive pulmonary disease ("COPD"), pneumonia, and congestive heart failure. Whitaker took a number of medications for her mental and physical conditions.

In the final two months of Whitaker's life, she was hospitalized on two different occasions. Whitaker's first hospitalization took place from May 1 to May 14, 2003 for a breathing condition. Whitaker returned to Friendship Village on May 15, 2003,

after which she was essentially bedridden. Whitaker's next hospitalization took place from June 16 to June 19, 2003 for respiratory failure. She returned to Friendship Village on June 20, 2003, and died four days later.

Between Whitaker's two hospitalizations, on May 22, 2003, Miller obtained a check in the amount of $15,000.00 written from Whitaker's account ("the check"). Whitaker signed the check, but Miller filled in all of the other parts of the check: the date of May 22, 2003, her own name in the "pay to" area, and the $15,000.00 amount in numbers and in writing. Miller also endorsed the back of the check and cashed the check.

Louise Behlman ("Behlman"), Whitaker's niece and power of attorney, discovered the check had been issued when she was going through Whitaker's papers after Whitaker's death.[1] On June 27, 2003, Behlman reported her discovery to Friendship Village because she believed the check was altered. On that same day, Friendship Village reported the situation to the Department. Peggy Post ("Post") of the Department conducted an investigation of the situation and called the police. The police also conducted an investigation,[2] and arranged for the $15,000.00 to be removed from Miller's account and returned to Whitaker's estate.

On January 26, 2004, the Department notified Miller that, because the results of its investigation tended to substantiate the conclusion that Miller misappropriated money from Whitaker, it intended to permanently place Miller's name on the EDL. On January 28, 2004, Miller completed an application for an administrative hearing, which was held by the Department on June 25, 2004. Subsequently, on August 16, 2004, the Department issued its decision ordering Miller's name to be permanently placed on the EDL because there was competent and substantial evidence that Miller misappropriated $15,000.00 from Whitaker. On September 10, 2004, Miller petitioned the trial court for judicial review of the Department's decision. On April 18, 2005, the trial court entered its judgment affirming the Department's decision. This appeal by Miller followed.

In her sole point on appeal, Miller contends the Department's decision ordering her name to be permanently placed on the EDL for misappropriating the check is not supported by competent and substantial evidence.

In our review of an administrative agency's decision, we review the findings and decision of the agency and not the judgment of the trial court. *Lagud v. Kansas City Bd. of Police Com'rs*, 136 S.W.3d 786, 791 (Mo.banc 2004). An agency's decision can be reviewed to determine if it is supported by competent and substantial evidence upon the whole record. *Id., quoting* section 536.140.2(3), RSMo 2000.[3] An agency's decision is unsupported by competent and substantial evidence only in the rare case when the decision is contrary to the overwhelming weight of the evidence. *Id., quoting Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo.banc 2003). While we defer to the agency's factual findings, where the agency's decision is based upon an interpretation, application or conclusion of law, we

---

1. Behlman discovered the check when she saw it listed on Whitaker's bank statements.

2. Miller was charged with the crime of stealing, but these charges were dropped due to the fact that Whitaker was deceased.

3. All statutory references are to RSMo 2000, unless otherwise indicated.

review the agency's decision de novo. *Community Bancshares v. Secretary of State,* 43 S.W.3d 821, 823 (Mo.banc 2001).

Section 198.090.15 provides that:

[t]he department shall maintain the employee disqualification list and place on the employee disqualification list the names of any persons who have been finally determined by the department, pursuant to section 660.315, RSMo, to have *misappropriated* any property or funds of a resident while employed in any facility. (emphasis added). Section 198.090.15.

"No person, corporation or association who received the employee disqualification list ... shall knowingly employ any person who is on the employee disqualification list." Section 660.315.12 (amended 2003). Section 660.315.9 provides in relevant part that:

"[t]he length of time the person's name shall appear on the employee disqualification list shall be determined by the [Department], based upon the following: (1)[w]hether the person acted recklessly or knowingly ...; (3)[t]he degree of misappropriation of the property or funds ...; (5)[a]ny mitigating circumstances; [and] (6)[a]ny aggravating circumstances." Section 660.315.9 (amended 2003).

Because "misappropriate" is not expressly defined in the Missouri statutes and regulations governing the nursing home industry, the term is given its plain and ordinary meaning as found in the dictionary. *Wells v. Dunn,* 104 S.W.3d 792, 796 (Mo.App. W.D.2003). Common to various dictionary definitions of the term "is

the idea that misappropriation involves the dishonest diversion of the money or property of another to one's own use." *Id.* at 797.

■ A person who exerts undue influence uses dishonest motives to substitute his will for the will of another. *Welch v. Welch,* 354 Mo. 654, 190 S.W.2d 936, 938 (1945). Undue influence is influence amounting to overpersuasion, force, or coercion. *Kramer v. Schramm,* 59 S.W.3d 585, 585 (Mo.App. E.D.2001), *quoting Strauser v. Dayton,* 762 S.W.2d 862, 865 (Mo.App. E.D.1989). Coercion can be shown through evidence of the exploitation of another's special vulnerability. *See State v. Garner,* 103 S.W.3d 866, 870 (Mo. App. S.D.2003), *quoting People v. Knapp,* 244 Mich.App. 361, 624 N.W.2d 227, 235 (2001).

■ In determining whether undue influence exists, we consider the following factors: "the extreme age of the [donor], his impaired physical condition, his mental debility, not necessarily amounting in complete incompetency, and the absence of competent and bona fide independent advice." *Farnsworth v. Farnsworth,* 728 S.W.2d 223, 227 (Mo.App. W.D.1986). Another factor is whether the donee was active in some way which caused the execution of the instrument. *See id.* To establish undue influence, it is not necessary to establish the existence of a confidential relationship between the donor and the donee. *Strauser,* 762 S.W.2d at 865.

■ In this case, Miller admits that she appropriated funds [4] from Whitaker.[5]

---

4. Because of this admission, for purposes of this opinion all further references to "the date of the appropriation" will refer to May 22, 2003, the date Miller obtained the check from Whitaker.

5. Miller also concedes that she violated sections 198.090.2 and .6 "by virtue of the fact that she accepted the gift and did not report it." Because of the context of her admission, we believe Miller intended to concede she violated sections 198.090.2 and .3. Section

Thus, the only issue is whether there is competent and substantial evidence in the record that Miller's appropriation was dishonest.

The Department's decision did not make a specific finding as to whether Miller exercised undue influence over Whitaker in obtaining the check. However, the Department did make the following findings which suggest the existence of undue influence: (1) "[Miller] ... dishonestly obtained a check written against the account of [Whitaker]," (2) "Whitaker was made vulnerable due to declining health and the influence of powerful medications," and (3) "[Miller] exploited Whitaker's vulnerability using her position as Whitaker's care provider."

On the date of the appropriation, Whitaker was eighty-three years old. There is evidence that around that time Whitaker's physical condition was poor. In May of 2003, Whitaker was diagnosed with acute respiratory failure, pneumonia, and had a history of congestive heart failure and chronic obstructive pulmonary disease. On May 15, 2003, Whitaker returned to Friendship Village after a two-week stay in the hospital and was essentially bedridden. Whitaker was hospitalized again from June 16 to June 19, 2003 for respiratory failure, and she died on June 24, 2003. The date of the appropriation took place in between Whitaker's two hospitalizations.

There is conflicting evidence as to Whitaker's mental condition around the date of the appropriation. In May of 2003, Whitaker was diagnosed with dementia. On May 21, 2003, one day before the date of the appropriation, Whitaker was diagnosed with depression. On May 21, 2003, and on June 11, 2003, Whitaker was taking, *inter alia*, Xanax and Buspar. Possible side effects of Xanax and Buspar are anxiety, delirium, worsening of cognitive functions, sedation, and dizziness.

The two psychiatric evaluations in the record closest in time to the date of the appropriation took place on March 21, 2003 and June 11, 2003. The March 21, 2003 evaluation indicates that Whitaker's flow and content of thought were within normal limits, she was alert but disoriented as to time, and she had poor insight. The June 11, 2003 evaluation indicates that her content of thought was "helplessness," she was alert and oriented, and her insight and judgment were within normal limits.

Mary Pommier ("Pommier"), an advance practice nurse board certified in geriatric nursing, saw Whitaker at least once a month from March of 2002 until Whitaker's death in June of 2003. Pommier testified that during the last two months of Whitaker's life, Whitaker could not make any decisions and that she and Whitaker's doctor deferred to Behlman for those decisions.

Geriatric nurse practitioner Michele Roberts ("Roberts") saw Whitaker in conjunction with Whitaker's psychiatrist and treating physician every three to six weeks from 2002 until Whitaker's death in June of 2003. Roberts stated that Whitaker experienced periods of confusion which increased during the last two months of Whitaker's life. Roberts further testified that during the time period around the date of the appropriation, "[Whitaker's] dementia progressed to the point with the other medical complications, with her COPD, hypoxia, deliriums that she'd been

198.090.2 mandates that a nursing home employee who receives a gift valuing ten dollars or more from a resident report the gift to the operator of the home. Section 198.090.3 prohibits a nursing home employee from accepting $100 or more from a resident. Section 198.090.6 criminalizes a nursing home employee for diverting personal funds from a resident.

going in and out of, that it was impossible for her to clearly make decisions regarding a lot of her money." Roberts also stated that, based upon her interaction with Whitaker, she believed that Whitaker did not have the capacity to make a gift to someone on the date of the appropriation, and that Whitaker could not understand the significance of her actions.

Miller testified that Whitaker, although diagnosed with dementia, "knew what she was doing" and knew enough to know what was going on with her finances.

Delores Feuerstine ("Feuerstine"), Whitaker's bookkeeper for about five years, testified that during the last time she visited Whitaker prior to her death, Whitaker told her she would find a check entry for $15,000.00 to a nurse who was kind to her as a down payment on a house. Feuerstine believed Whitaker was "sharp as a tack." While Feuerstine was aware that Whitaker was seeing a psychiatrist, she was unaware Whitaker was diagnosed with dementia. Feuerstine also stated she never knew Whitaker to be confused, disoriented, or anxious.

Whitaker also failed to seek competent and bona fide independent advice prior to the date of the appropriation, even though Whitaker could have consulted with either Behlman, her power of attorney, or Feuerstine, her bookkeeper. For about five years, Feuerstine visited Whitaker once a month to balance the books and fill out any necessary checks, which Whitaker would sign. During that time, the only persons who filled out checks for Whitaker to sign were Feuerstine and Whitaker's friend across the hall, except when Miller filled out the check to herself on the date of the appropriation.

Miller actively procured the check by filling in the details of the check: the date of the appropriation, her own name in the "pay to" area, and the $15,000.00 amount in numbers and in writing. Miller also endorsed the back of the check and cashed the check.

Although there is conflicting evidence as to Whitaker's state of mind on the date of the appropriation, because Whitaker's mental condition is only one factor suggesting undue influence, we cannot say the Department's decision is contrary to the overwhelming weight of the evidence. Rather, the record reflects that Whitaker's extreme age, her impaired physical condition, her questionable mental condition, the absence of competent and bona fide independent advice, and Miller's active procurement of the check constitutes competent and substantial evidence to support the Department's findings which suggest the existence of undue influence. Thus, there is competent and substantial evidence that Miller dishonestly obtained the check from Whitaker. Further, the Department's finding that "[Miller] ... dishonestly obtained a check written against the account of [Whitaker]" can be construed as a finding of misappropriation. Therefore, there is competent and substantial evidence that Miller misappropriated the check from Whitaker.

The Department's decision ordering Miller's name to be *permanently* placed on the EDL is also supported by competent and substantial evidence because of the degree of misappropriation and the presence of aggravating circumstances. The degree of Miller's misappropriation was extensive given that the amount of the check was $15,000.00 and aggravating circumstances existed due to Whitaker's extreme age, her physical condition, and her questionable mental condition. Point denied.

Based on the foregoing, the judgment of the trial court is affirmed.