Crystal Gayle ARAGON, Respondent,

v.

**MISSOURI DEPARTMENT OF HEALTH AND SENIOR SERVICES, Appellant.**

No. WD 72751.

Missouri Court of Appeals,
Western District.

May 10, 2011.

Jonathan M. Hensley, Jefferson City, MO, for appellant.

Kendall R. Garten, Blue Springs, MO, for respondent.

Before Division Two: JAMES M. SMART, JR., Presiding Judge, MARK D. PFEIFFER, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Crystal Aragon ("Aragon") appeals from the decision of the Department of Health and Senior Services ("Department") to place Aragon's name on the Employee Disqualification List ("EDL"). Aragon contends that the Department's determination that Aragon misappropriated funds from a nursing home resident is unsupported by competent and substantial evidence; is unauthorized by law; is arbitrary, capricious or unreasonable; and/or involves an abuse of discretion. We agree. We affirm the trial court's judgment reversing the Department's decision and remand this matter to the trial court to render an attorney's fees and costs decision pursuant to section 536.087.[1]

**Factual and Procedural History**

In 2003, Aragon, then twenty years old, began working as a CNA at Shirkey Nursing and Rehabilitation Center ("Shirkey") in Richmond, Missouri. Donald Witt ("Witt") was a 68 or 69 year-old resident at Shirkey at that time. Witt resided at Shirkey because he was a wheelchair bound paraplegic who required some physical assistance. Witt did not, however, suffer from a mental infirmity requiring residential nursing home care. In fact, Witt was able to come and go from Shirkey as he pleased driving his handicap-adapted van.

Aragon assisted Witt. Aragon developed a close friendship with Witt. Aragon considered Witt a "best friend." On days when Aragon did not work, Witt would call her on the phone, and would often drive over to visit her at her home. Witt would take Aragon and her daughter out to eat from time to time. Aragon would run errands for Witt. Aragon confided in Witt about problems she was having with her boyfriend, the father of Aragon's daughter. Witt repeatedly encouraged Aragon to improve herself, specifically encouraging her to attend nursing school. Witt would tell Aragon that she was smart enough and could succeed.

In July 2005, Aragon informed Witt that she had decided to take his advice to pursue a nursing degree. Aragon mentioned that she needed to purchase a dependable vehicle to get back and forth to school. Witt offered to help Aragon look for a car.

Witt and Aragon went car shopping in Lexington. Aragon was unable to find a car within her price range. Witt drove Aragon to Excelsior Springs. Witt told Aragon he would take the lead in the negotiations because Aragon had never purchased a car.

Witt negotiated the price on a vehicle for Aragon. Because Aragon had no credit history, Witt told the salesperson to run his credit history. Witt co-signed Aragon's loan. Though Aragon could afford the monthly car payment, she could not afford the payment if the sales tax and insurance were rolled into the loan balance. Witt told Aragon he would help her with the sales tax and insurance.

1. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

On July 20, 2005, Witt wrote Aragon a check for $1,296.00 to cover the sales tax and insurance. Witt accompanied Aragon to the license bureau to pay the sales tax and to secure the title for the vehicle. Aragon accepted Witt's assistance even though Aragon had been trained by Shirkey not to accept gifts or money from residents. Aragon did not report Witt's financial assistance to Shirkey.

In March 2006, Aragon advised Witt that she intended to end the relationship with her boyfriend and to move in with her aunt in Higginsville, Missouri. Aragon gave two weeks' notice to Shirkey. Aragon's last day of work at Shirkey was on April 9, 2006.[2]

Witt offered to take Aragon shopping for household items in preparation for her move. However, Witt's health began to decline around this time. Witt's physical condition was complicated by chronic obstructive pulmonary disease ("COPD"), a condition which can cause diminished lung capacity. Witt told Aragon to go shopping for household items without him, and to use his credit card. Aragon declined. Aragon completed her move to her aunt's house. She remained in contact with Witt.

Soon after moving to her aunt's house, Aragon unexpectedly received a credit card in the mail. Aragon called Witt. Witt told Aragon that he had added her as an authorized user on his credit card account. Witt again told Aragon that he wanted her to use the card to buy furniture that she needed, and that she could start paying him back when she was able to do so. Aragon used the credit card on April 23, 2006, to buy furniture at Nebraska Furniture Mart totaling over $4,000.00.

In October 2006, Witt's health further declined due to his COPD. He was hospitalized and died on November 23, 2006, at the age of seventy-one.

While Witt was in the hospital, Witt's daughter and designated power of attorney, Donna Woodland ("Woodland"), had Witt's mail forwarded to her. She began to examine Witt's finances. Woodland discovered Aragon's purchase at Nebraska Furniture Mart in August 2006, and the $1,296.00 check Witt had written to Aragon in July 2005. Woodland notified the authorities.

On November 11, 2006, a felony warrant was issued charging Aragon with financial exploitation of an elderly/disabled person, a class B felony. The charge was later dismissed.

In March 2008, the Department notified Aragon that it was proposing the permanent placement of Aragon's name on the EDL because Aragon had misappropriated funds from Witt. Aragon requested an administrative hearing. On September 12, 2008, the Department's Administrative Hearings Unit issued its Decision and Order ("Decision") finding that Aragon misappropriated funds from Witt, and permanently placing Aragon's name on the EDL.

On October 8, 2008, Aragon filed a petition for judicial review of the Department's Decision. The trial court entered its judgment ("Judgment") reversing the Department. The Judgment found that the Decision: (1) was unsupported by competent and substantial evidence on the whole record; (2) was unauthorized by law; (3) was arbitrary and capricious; and (4) involved an abuse of discretion. The Department appeals.

2. Aragon did convert to "PRN" status at this time, making her subject to being called in to work if needed. However, Aragon was never called in to work, and was removed from PRN status sixty days later in accordance with Shirkey's policy.

## Standard of Review

On appeal from an administrative agency decision in contested cases, we review the findings and decision of the agency, not the judgment of the trial court. *Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 791 (Mo. banc 2004). "[A] court reviewing the actions of an administrative agency should make a 'single determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the award.'" *Albanna v. State Bd. Of Registration for Healing Arts*, 293 S.W.3d 423, 428 (Mo. banc 2009) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003)). "This standard would not be met in the rare case when the [agency's decision] is contrary to the overwhelming weight of the evidence." *Lagud*, 136 S.W.3d at 791. "When the agency's decision involves a question of law, the court reviews the question *de novo*." *Albanna*, 293 S.W.3d at 428.

## Analysis

In her sole point on appeal, Aragon[3] contends that the Department's decision to place her on the EDL is unsupported by competent and substantial evidence upon the whole record; is arbitrary, capricious and unreasonable; and involves an abuse of discretion; because the money given or lent to her by Witt was not misappropriated.

Aragon does not dispute that by accepting the $1,296.00 check from Witt, and by failing to report the receipt of the check to Shirkey, she violated section 198.090.2, which provides in pertinent part that:

> *Any* owner, operator, manager, *employee,* or affiliate of an owner or operator *who receives any personal property or anything else of value from a resident, shall,* if the thing received has a value of ten dollars or more, *make a written statement giving the date it was received,* from whom it was received, and its estimated value.

(Emphasis added.)[4] Aragon contests whether she violated section 198.090.2 by purchasing furniture on the credit card Witt provided her, as that purchase was made *after* her last day of work at Shirkey on April 9, 2006, and thus after she was an "employee." Shirkey claims that because Aragon remained on the PRN list for 60 days after her last day of work, she remained an "employee" subject to the restrictions of section 198.090 until June 9, 2006.

Whether Aragon violated section 198.090.2 once or twice, Aragon argues that her mere violation of section 198.090.2 did not equate with misappropriation, and thus did not permit the Department to place her on the EDL. Instead, as Aragon points out, the placement of an employee on the EDL is covered by section 198.090.15 which provides:

> The department shall maintain the employee disqualification list and place on the employee disqualification list the names of any persons who have been finally determined by the department, pursuant to section 660.315, RSMo,[5] to

---

**3.** Though the Department initiated this appeal from the trial court's Judgment, pursuant to Rule 84.05(e), Aragon is treated as the appellant, as our review is of the Department's Decision, and not of the trial court's Judgment.

**4.** In fact, it appears that Aragon also violated section 198.090.3, which prohibits an employ-

ee of a facility from receiving anything of value from a resident exceeding a value of one hundred dollars within any calendar year, regardless whether the receipt is reported to the facility.

**5.** Section 660.315 describes the procedure the Department must employ to place an individual on the EDL, as well as the individual's

have ***misappropriated any property or funds of a resident while employed in any facility.***

(Emphasis added.)

■ Plainly, the placement of a person on the EDL pursuant to section 198.090.15 requires the satisfaction of two conditions: (1) that the person misappropriated property or funds of a resident, and (2) that the person was employed by the facility at the time of the misappropriation. The Department has the burden of establishing these conditions by a preponderance of the evidence. *See, e.g., Wells v. Dunn,* 104 S.W.3d 792, 796 (Mo.App. W.D.2003).

The Department does not argue (at least not overtly) that it met its burden to establish these conditions by proving that Aragon violated section 198.090.2. In fact, we concluded in *Wells* that a mere violation of the mandatory reporting requirements of section 198.090.2 does not *ipso facto* constitute the misappropriation of funds under section 198.090.15. 104 S.W.3d at 796. Our conclusion in *Wells* is consistent with the fact that sections 198.090.9 and 198.090.10 combine to provide that upon receipt of a report of any violation of section 198.090, (which would include a violation of section 198.090.2), the Department is to investigate the violation to determine ***whether*** a "probable misappropriation of property or funds of a resident" has oc-

curred. Thus, the Department necessarily concedes that to establish that Aragon misappropriated funds from Witt under section 198.090.15, the Department was required to establish something more than Aragon's unreported acceptance of funds from Witt.[6]

The term "misappropriate" is not defined by section 198.090. Thus, "it is to be accorded its plain and ordinary meaning as found in the dictionary." *Wells,* 104 S.W.3d at 796. In *Wells,* this Court examined multiple dictionary definitions of the term "misappropriate" and concluded that "common to all these definitions is the idea that misappropriation involves the dishonest diversion of the money or property of another to one's own use."[7] *Id.* at 797.

The definition of misappropriation framed in *Wells* was favorably discussed and amplified in *Miller v. Dunn,* 184 S.W.3d 122, 125 (Mo.App. E.D.2006). In *Miller,* the Eastern District observed that misappropriation involves undue influence. *Id.* "A person who exerts undue influence uses dishonest motives to substitute his will for the will of another." *Id.* (citing *Welch v. Welch,* 354 Mo. 654, 190 S.W.2d 936, 938 (1945)). "Undue influence is influence amounting to over-persuasion, force, or coercion." *Id.* (citations omitted). The court in *Miller* identified several fac-

right to seek review from the Department's decision. Section 660.315 also describes the factors relevant to determining how long a person's name should remain on the EDL. Section 660.315 does not, however, describe the circumstances which can give rise to the placement of an individual on the EDL.

6. Distinct from the issue of whether Aragon's conduct warranted her placement on the EDL, Aragon's acceptance of funds from Witt in violation of section 198.090.2, section 198.020.3, and Shirkey's policies and procedures, would have justified the termination of Aragon's employment.

7. The *Wells* Court noted: "[T]he word 'misappropriate' is a verb meaning 'to apply to illegal purposes; to appropriate dishonestly for one's own use: embezzle.' Webster's Third New International Dictionary 1442 (1993). Other dictionaries offer similar definitions. *See, e.g.,* VI The Oxford English Dictionary 495 (1933) ('To appropriate to wrong uses; chiefly, to apply dishonestly to one's own use money belonging to another'); BLACK'S LAW DICTIONARY 1013 (7th ed.1999) (defining 'misappropriation' as the 'application of another's property or money dishonestly to one's own use')." 104 S.W.3d at 797.

tors which may operate to suggest the presence of undue influence.

> In determining whether undue influence exists, we consider the following factors: "the extreme age of the [donor], his impaired physical condition, his mental debility, not necessarily amounting in complete incompetency, and the absence of competent and bona fide independent advice." Another factor is whether the donee was active in some way which caused the execution of the instrument. To establish undue influence, it is not necessary to establish the existence of a confidential relationship between the donor and the donee.

*Id.* (internal citations omitted).

Given the definition of "misappropriation" established in *Wells* and *Miller*, the dispositive issue in this case is whether the Department demonstrated by competent and substantial evidence considering the whole record that Aragon's acceptance of funds from Witt was dishonest and/or the result of the exercise of undue influence. We conclude that the Department did not meet this burden.

The Department made the following findings of fact in its Decision pertinent to this inquiry:

1. [D]uring the period of March of 2005 until June 9, 2006. . . . [Aragon] provided direct care to Donald Witt, a resident of the Shirkey facility;

2. Donald Witt was a seventy-one year old resident. . . . Mr. Witt was characterized as being alert, oriented, and his own responsible person. Mr. Witt, a paraplegic, required assistance with his activities of daily living; with his transfers from his bed to his wheelchair and back; and with his incontinence care.

3. [Aragon] was trained as an employee of the Shirkey facility, not to accept money or gifts from residents of the facility. [Aragon] acknowledged being so trained.

4. [Aragon] received a personal check from Mr. Witt in July of 2005, in the amount of $1,296.00. [Aragon] acknowledged receiving and cashing said check. [Aragon] shared a joint credit card account with Mr. Witt, and utilized said account to make purchases in excess of $4,000.00. [Aragon] acknowledged using the credit card.

5. [Aragon] accepted and utilized the funds and credit of a seventy-one year old, paraplegic, total care resident of a long-term care facility in which she was employed. [Aragon's] actions violated State statutory prohibitions intended to prevent such activities from occurring between nursing facility employees and nursing facility residents.

6. There was conflicting evidence regarding Mr. Witt's state of mind at the time of the noted transactions. There was no evidence that Witt sought independent advice regarding his finances.

7. [Aragon] accepted and utilized the funds and credit of a vulnerable facility resident in violation of her employer's specific rules and policies against such activity. [Aragon] was aware of her employer's rules and policies prohibiting such actions.

8. [Aragon] misappropriated funds and credit from resident Donald Witt, a resident of a long-term care facility at which [Aragon] was employed.

The findings which conclude that Aragon received money from Witt while employed at Shirkey in violation of a statute and/or of Shirkey's policies (findings of fact numbers 1, 3, 4, 5, and 7) are insufficient *as a matter of law* to support the conclusion that Aragon "misappropriated" funds. *Wells,* 104 S.W.3d at 796.

The only other relevant findings made by the Department were that Witt had an

impaired physical condition (finding of fact number 2), that there was conflicting evidence of Witt's mental state at the time of the transactions (finding of fact number 6), that Witt did not seek independent advice regarding his finances (finding of fact number 6), that Witt was "vulnerable" (finding of fact number 7), and that Aragon misappropriated funds (finding of fact number 8).

The finding that Aragon misappropriated funds (finding of fact number 8) is not a precise factual finding, but is instead an ultimate legal conclusion. In fact, it is the ultimate legal conclusion the Department was obliged to establish in order to support its determination to place Aragon's name on the EDL. As such, we afford that conclusion *de novo* review. *Albanna,* 293 S.W.3d at 428. Thus, unless the Department made factual findings supported by competent and substantial evidence considering the whole record suggesting Aragon acted dishonestly or exercised undue influence, the Department's "finding" of misappropriation is unauthorized by law.

The finding that Witt suffered a physical impairment (finding of fact number 2) is not contested. Physical impairment was identified by the court in *Miller* as a "factor" which can suggest the exercise of undue influence. 184 S.W.3d at 125. However, the presence of physical impairment is not self-proving of undue influence. Thus, Witt's physical impairment does not independently support the conclusion that Aragon acted dishonestly in accepting funds from Witt.

The Department found that the evidence was conflicting regarding Witt's "state of mind" at the time of the noted transactions (finding of fact number 6). This is not so much a finding as it is a mere observation. Stated differently, the Department did not find one way or the other whether Witt had the mental capacity to make a know-ing and voluntary decision to offer financial assistance to Aragon. In fact, our review of the whole record reveals no evidence which would provide competent and substantial support for a conclusion that Witt suffered from a mental infirmity of any kind at the time he volunteered to provide financial assistance to Aragon. In addition to Aragon's testimony about Witt's state of mind and conduct, recounted in our factual summary, Nancy Gamble ("Gamble"), the Department's lead investigator, testified that she interviewed Witt on August 10, 2006. This interview occurred a year *after* Witt wrote Aragon the $1,296.00 check, and four months *after* Aragon made the purchase on Witt's credit card. Gamble testified that Witt was alert, oriented, and capable of making his own decisions. Witt told Gamble that he handled his own finances and that his finances were none of Gamble's or anyone else's business, especially his two daughters. Witt told Gamble that nobody had taken advantage of him. At the time of the interview, Witt was still able to come and go from Shirkey as he pleased.

Chris Brown, the executive director at Shirkey, testified that Witt was intelligent, a good communicator, well read, and "sharp as a tack."

Woodland, Witt's daughter, testified that Witt would give gifts to people in need and that he was a very generous man. Woodland testified that her mother had been abusive to Witt, and that Woodland helped Witt secure a divorce from her mother, resulting in a rift between Woodland and her sister and mother. Woodland reported that Witt had given her a down payment for her home and had paid for her college.

Kristy Jacobs ("Jacobs"), a social worker at the Kansas City Veterans Administration Hospital, had four interactions with Witt during October and November of

2006. Jacobs stated that Witt was alert and oriented. Witt told Jacobs that "his finance business was his own business and nobody needed to know what he was doing." Jacobs stated that Witt was his own person and made his own decisions.

Dana Elliott, a former Shirkey employee, reported that when she was in the process of getting a divorce, Witt told her that he wanted to help her and loaned her $1000.

The *only* evidence "in conflict" with these specific descriptions of Witt's clear mental state was the testimony of nurse Stacy Williams ("Williams"), the unit coordinator in charge of nursing staff at Shirkey. COPD can result in diminished oxygen saturation, causing confusion in some patients. Williams testified that the first time she noted any confusion on the part of Witt which she attributed to his COPD was sometime in March of 2006.

Based on a consideration of the whole record, the Department could not have concluded based upon competent and substantial evidence that Witt's "state of mind" was compromised at the time he offered assistance to Aragon. In any event, as previously noted, the Department did not make such a finding—but merely observed that the evidence of Witt's mental state was in conflict.

The finding that Witt sought no independent financial advice (finding of fact number 6) is uncontested. The absence of independent financial advice was identified by the court in *Miller* as a "factor" which can suggest the exercise of undue influence. 184 S.W.3d at 125. However, the absence of independent financial advice alone does not prove undue influence. In fact, the Department's finding is completely consistent with the evidence that Witt was fiercely independent, and was not only capable of, but insistent upon, making his own financial decisions.

The Department found that Witt was "vulnerable" (finding of fact number 7). No one testified that Witt was vulnerable. The Department's characterization is suspect in light of the specific evidence of Witt's "sharp" mental state, and of Witt's relative physical independence notwithstanding the fact that he was a paraplegic. Even if consideration of the whole record supported the conclusion that Witt was "vulnerable," (which we question), that alone would not permit us to conclude that Aragon exercised undue influence over Witt in the absence of any evidence that Aragon took advantage of the vulnerability. *Miller,* 184 S.W.3d at 125 (holding that coercion may be shown where there is evidence of the *exploitation* of a person's special vulnerability).

We conclude after considering the whole record that there is no evidence suggesting that Aragon acted dishonestly or exerted undue influence. There is thus no evidence suggesting Aragon misappropriated funds from Witt. The Department did not find that Witt's assistance to Aragon was not voluntarily offered. The Department did not find that Aragon demanded or manipulated Witt's assistance. There was no evidence that Aragon facilitated the preparation of the $1,296.00 check Witt executed. There was no evidence that Aragon asked for a credit card from Witt.

Certainly, Aragon exercised poor judgment. Certainly, Aragon violated Shirkey's policies and procedures in a manner which would have warranted her termination from employment. Certainly, Aragon violated section 198.090.2 and section 198.090.3, violations which subjected Aragon to the ramifications therein specified. We do not intend to suggest by our decision, therefore, that we condone Aragon's conduct. However, section 198.090.2 and section 198.090.3 describe conduct involv-

ing the receipt or "appropriation" of money or an item of value, without regard to whether the receipt or appropriation is coupled with dishonesty sufficient to render the conduct a "misappropriation." The legislature did not provide that an employee can be placed on the EDL for an "appropriation" of money or an item of value. The legislature only provided for the placement of an employee's name on the EDL if the employee has "misappropriated" money or an item of value. It follows, therefore, that the "dishonesty" which must be demonstrated to convert an "appropriation" into a "misappropriation" must be something more than a violation, even a knowing violation, of one of the subsections of section 198.090. Otherwise, a violation of one of the subsections of section 198.090 would be tacitly rendered a *per se* basis for placement of a person on the EDL, an outcome not directed or anticipated by the current legislative scheme. We conclude, therefore, that unless and until the legislature provides to the contrary, the Department cannot establish a misappropriation under section 198.090.15 based solely on a claim that an employee's violation of section 198.090.2 or section 198.090.3 evidences dishonesty.

The decision we reach in the present case is analogous to our decision in *Wells*. In *Wells*, the Division of Aging [8] determined that Wells had misappropriated $100 from a ninety-one year old nursing home resident and should be placed on the EDL. 104 S.W.3d at 793. Wells sought judicial review. *Id.* Wells explained that the money was reimbursement for various small purchases for such things as cough drops, candy, stamps, and fast food that Wells had purchased for the resident. *Id.* at 794. The agency argued that because Wells had violated the mandatory written reporting provisions of section 198.090.2, she had *ipso facto* misappropriated funds. *Id.* at 795–96. As discussed above, this Court found that a mere violation of section 198.090.2 does not authorize the agency to place a person's name on the EDL upon violation of its provisions. In so determining, this court found that the agency's findings were devoid of findings demonstrating misappropriation such as that Wells fraudulently or dishonestly procured the check, that Wells did not run personal errands for the resident using her own funds, or that Wells otherwise diverted funds from the resident to which she had no legitimate claim. *Id.* at 797 n. 8. This Court further noted that there were indications in the record inapposite to the missing findings. *Id.* In summary, this Court found that although Wells may have violated the reporting requirements in section 198.090.2, she did not misappropriate funds from a resident pursuant to section 198.090.15. *Id.* at 797. The facts in *Wells* are materially indistinguishable from the facts in the present case.

The Department argues that the circumstances in this case are more like those in *Miller*, where the Eastern District affirmed the placement of Miller's name on the EDL for misappropriating $15,000 from a resident of a nursing home. We disagree. Miller was aware that the resident, who was eighty-three years old, suffered from dementia, major depressive disorder, anxiety (severe at times), obsessive-compulsive disorder traits, periods of delirium, depression, acute respiratory failure, anemia, chronic obstructive pulmonary disease ("COPD"), pneumonia, and congestive heart failure. 184 S.W.3d at 123. The resident took a number of medications for both her mental and physical conditions. *Id.* Two months prior to her death, the

---

8. The Division of Aging was transferred from the Department of Social Services to the Department of Health and Senior Services in 2001. *Wells*, 104 S.W.3d at 793, n. 1.

resident was hospitalized on two occasions. *Id.* After the first hospitalization, the resident was bedridden. *Id.* at 124. The second hospitalization occurred a month later. *Id.* Four days later, the resident died. *Id.* Between the two hospitalizations, Miller obtained a check in the amount of $15,000 from the resident's account. *Id.* Although the resident signed the check, Miller filled in her own name, the amount in numbers, and the amount in writing. *Id.* There was medical evidence that the resident was unable to make any decisions in the two months preceding her death, that she did not have the capacity to make a gift to someone, and that the resident could not understand the significance of her actions. *Id.* at 126–27. None of these egregious circumstances are present in the case before us.

In light of the foregoing discussion, we conclude that the Department's Decision permanently placing Aragon on the EDL for misappropriation of funds is not supported by competent and substantial evidence considering the whole record, and is unauthorized by law. Because we so conclude, we need not address whether the Department properly determined that Aragon was an "employee" on April 23, 2006, the day she made the purchase on Witt's credit card.

## Conclusion

The trial court's Judgment reversing the Department's Decision is affirmed. Aragon's application for attorney's fees and costs filed in the trial court pursuant to the authority of section 536.087[9] remains pending. Aragon timely filed an applica-

9. Section 536.087 provides that a party who prevails in a Circuit Court action upon judicial review of an agency decision shall be entitled to attorney's fees if the position of the State was not substantially justified. However, section 536.086.4 provides that should the State appeal the Circuit Court's determination

tion for attorney's fees with this court pursuant to Local Rule XXIX, alerting us to the application for attorney's fees and costs pending in the trial court. We remand this case, therefore, to the trial court for the sole purpose of rendering a decision pursuant to section 536.087. *Wells,* 104 S.W.3d at 797 (citing *Pulliam v. State,* 96 S.W.3d 904 (Mo.App. W.D.2003)).

All concur.

to this Court, no decision on a pending application for fees or costs shall be made until a final decision is made on appeal. Nothing in this Opinion is intended to suggest that the State's position, though unsuccessful, was not substantially justified.