

# In the
## Missouri Court of Appeals
### Western District

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF GRAIN BELT EXPRESS LLC FOR AN AMENDMENT TO ITS CERTIFICATE OF CONVENIENCE AND NECESSITY AUTHORIZING IT TO CONSTRUCT, OWN, OPERATE, CONTROL, MANAGE AND MAINTAIN A HIGH VOLTAGE, DIRECT CURRENT TRANSMISSION LINE AND ASSOCIATED CONVERTER STATION; )))))))))))))))) | |
| MISSOURI PUBLIC SERVICE COMMISSION, ET AL., )))) | **WD86854**<br>**OPINION FILED:**<br>**OCTOBER 29, 2024** |
| Respondents, )) | |
| v. )) | |
| MISSOURI FARM BUREAU, MISSOURI SOYBEAN ASSOCIATION AND MISSOURI CATTLEMEN'S ASSOCIATION, ))))) | |
| Appellants. )) | |

### Appeal from the Public Service Commission

### Before Division Four: Anthony Rex Gabbert, Chief Judge, Presiding,
### Mark D. Pfeiffer, Judge, Gary D. Witt, Judge

Missouri Farm Bureau Federation, Missouri Cattlemen's Association, and

Missouri Soybean Association appeal the order of the Public Service Commission of the

State of Missouri. In their first point on appeal, they claim that the Public Service

Commission erred in relying on testimony because it limited cross-examination of that

testimony. In their second point on appeal, they claim that the Public Service Commission erred in denying an application for rehearing. In their third point on appeal, they claim the Public Service Commission erred when it ignored expert witness testimony. The order is affirmed.

**Facts**

The Public Service Commission ("the Commission") is the state agency authorized to regulate public utilities in the State of Missouri. Grain Belt Express, LLC ("Grain Belt") is a limited liability company organized under the laws of Indiana. Grain Belt is a wholly-owned subsidiary of Invenergy Transmission LLC, a Delaware company and affiliate of Chicago-based Invenergy LLC. The Invenergy companies develop renewable energy and transmission projects. They control the financing, construction, and management of the Grain Belt Express Transmission Line. Grain Belt is a public utility subject to the jurisdiction of the Commission.

Grain Belt plans to build a high-voltage direct current electric transmission line called the Grain Belt Express. The Grain Belt Express would transmit wind and solar energy from the plains of Western Kansas to the eastern United States through delivery points in Missouri and Indiana. Grain Belt's customers would consist principally of renewable energy producers and wholesale buyers of electricity, such as utilities, municipalities, and commercial and industrial customers. The Grain Belt Express would not provide retail electric service to end-use customers in Missouri.

2

In 2014, Grain Belt applied to the Commission for a certificate of convenience and necessity for the Missouri portion of the Grain Belt Express. The Commission evaluated the application under the five criteria known as the Tartan Factors.

> The factors considered are: a) there must be a need for the service; b) the applicant must be qualified to provide the proposed service; c) the applicant must have the financial ability to provide the service; d) the applicant's proposal must be economically feasible; and e) the service must promote the public interest.

*Missouri Landowners All. v. Pub. Serv. Comm'n*, 593 S.W.3d 632, 638 (Mo. App. E.D. 2019). The Commission found that Grain Belt did not demonstrate that the project was needed, economically feasible, or in the public interest. The Commission denied Grain Belt's application.

In August 2016, Grain Belt filed a modified application with the Commission for authorization to build the Missouri portion of the Grain Belt Express. In August 2017, the Commission rejected Grain Belt's application on procedural grounds. Grain Belt appealed the Commission's decision to the Missouri Court of Appeals, Eastern District. The Eastern District transferred the case to the Missouri Supreme Court. The Missouri Supreme Court concluded that procedural grounds did not prevent approving Grain Belt's application. It remanded for the Commission to determine whether Grain Belt's proposed utility project was necessary or convenient for the public service. *Grain Belt Express Clean Line, LLC v. Public Service Comm'n*, 555 S.W.3d 469, 474 (Mo. banc 2018). In March 2019, the Commission found that the project satisfied the Tartan Factors. It granted Grain Belt a certificate of convenience and necessity ("the

3

Certificate") and approved Grain Belt's application to build the Missouri portion of the proposed transmission line. The Eastern District affirmed that decision in December 2019. *Missouri Landowners All.*, 593 S.W.3d 632.

The Certificate granted in 2019 authorized Grain Belt to construct, own, operate, control, manage, and maintain a +600kV transmission line and associated facilities. The line would cross the Kansas River south of St. Joseph and traverse Buchanan, Clinton, Caldwell, Carroll, Chariton, Randolph, Monroe, and Ralls counties in Missouri. Grain Belt was authorized to build a converter station in Ralls County with the capacity to deliver 500 megawatts of electricity to the regional electrical grid. The transmission line would cross the property of approximately 570 Missouri landowners. The Commission imposed conditions on the Certificate granted in 2019 relating to financing, interconnection, nearby utility facilities, construction, maintenance, landowner interactions, and right-of-way acquisition.

On August 24, 2022 Grain Belt filed an application with the Commission to amend the Certificate. It proposed relocating the converter station from Ralls County to Monroe County and increasing the station's capacity from 500 megawatts to 2500 megawatts. A modified alternating current tie line called the "Tiger Connector" would link the Monroe County converter station with points of interconnection to regional transmission facilities 40 miles away in Callaway County.

This expanded version of the Grain Belt Express is known as "the Project." Grain Belt proposed constructing the transmission line in two phases. Phase I would begin in

4

Kansas and span most of Missouri. Phase II would extend from the Monroe County converter station to the transmission line's terminus in Sullivan County, Indiana. Phase I is expected to be in service by the end of 2027.

In support of its application, Grain Belt filed written testimony from expert witnesses regarding how the Project met the Tartan factors. Relevant to this appeal, two of those witnesses were M.R. ("Valuation Expert") and Dr. D.L. ("Public Benefit Expert"). Valuation Expert filed a report and testimony projecting the value of the transmission line to Missourians in terms of lower energy prices and reduced emissions. Public Benefit Expert filed a report and testimony calculating the transmission line's benefit to Missouri in terms of jobs, worker earnings, and fiscal impacts.

The Commission issued notice of the application and provided an opportunity for interested persons to intervene. Relevant to this appeal, the Commission granted intervention to Missouri Farm Bureau Federation, Missouri Cattlemen's Association, Missouri Soybean Association, and Missouri Joint Municipal Electric Utility Commission d/b/a Missouri Electric Commission ("Missouri Electric Commission").[1] The Commission conducted three public hearings to receive comments from the general public.

---

[1] Missouri Farm Bureau Federation, a nonprofit corporation, is the State of Missouri's largest agricultural organization. Missouri Cattleman's Association and Missouri Soybean Association are nonprofit corporations organized to advance the interests of Missouri's beef and soybean industries. Missouri Electric Commission is a joint action agency organized to meet the energy and power needs of municipal electric utilities.

The Commission held an evidentiary hearing on June 5-8, 2023. During the evidentiary hearing, the parties presented evidence relating to the following unresolved issues previously identified by the parties:

1. Does the evidence establish that the following amendments to the Certificate of Convenience and Necessity ("[the Certificate]") held by Grain Belt Express LLC ("Grain Belt Express") are "necessary or convenient for the public service" within the meaning of that phrase under section 393.170, RSMo:

   a. Relocating the Missouri converter station from Ralls County to Monroe County and increasing the capacity of the Missouri converter station from 500 MW to 2500 MW.

   b. Relocating the AC connector line (the "Tiger Connector") from Ralls County to Monroe, Audrain, and Callaway Counties.

   c. Constructing the Project in two phases.

   i. If the Commission determines that constructing the project in two phases is "necessary or convenient for the public service," should the Commission approve a modification to the "Financing Conditions," as set forth in Section I of Exhibit 1 to the *Report & Order on Remand* in Case No. EA-2016-0358, to allow for constructing the Project in two phases?

2. Should the Commission approve a modification of the Landowner Protocols, as referenced and incorporated into the *Report & Order on Remand* in Case No. EA-2016-0358, to modify the compensation package offered to Tiger Connector landowners?

3. If the Commission approves any or all of the foregoing amendments, what conditions, if any, should the Commission impose?

On October 12, 2023, effective November 11, 2023, the Commission granted Grain Belt's application to amend the Certificate, subject to conditions addressing operations, landowner concerns, and ongoing reporting requirements.

6

Missouri Farm Bureau Federation, Missouri Cattlemen's Association, and Missouri Soybean Association (collectively "the Agriculture Associations") appeal the order together and have filed a single Appellants' Brief and a single Reply Brief with this court. Grain Belt Express, the Commission, and Missouri Electric Commission have each filed a separate Respondent's Brief with this court.

**Standard of Review**

"Pursuant to Section 386.510,[2] our review of the Commission's final report and order is two-pronged." *Missouri Landowners All.*, 593 S.W.3d at 639 (internal quotation marks omitted). "[F]irst, the reviewing court must determine whether the [Commission's] order is lawful; and second, the court must determine whether the order is reasonable." *Id*. (internal quotation marks omitted). "The Commission's order is presumed valid, and the burden of showing the order is unlawful or unreasonable rests with the appellant." *Id*. (internal quotation marks omitted). "This procedure for judicial review in section 386.510 is exclusive and jurisdictional." *Id*. (internal quotation marks omitted).

"The first prong is the lawfulness of a [Commission] order." *Id*. (internal quotation marks omitted). "An order is lawful if the Commission acted within its statutory authority." *Id*. "If the reviewing court finds the Commission's order to be

---

[2] All statutory citations are to RSMo 2016 as supplemented unless otherwise stated.

unlawful, the order is overturned and the reviewing court need not reach the issue of the reasonableness of the [Commission's] order." *Id*. (internal quotation marks omitted).

"However, if the Commission's order is determined to be lawful, the reviewing court moves to the second prong to determine whether the order is reasonable." *Id*. at 640. "An order is reasonable if it is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious or where the [Commission] has not abused its discretion." *Id*. (internal quotation marks omitted).

As an initial matter, we note that the Agricultural Associations do not argue that the Commission's order is unlawful. Instead, their points are focused on whether the order is reasonable. "We defer to the Commission's findings of fact, but whether a statute applies to a given set of facts is a question of law this Court will review *de novo*." *Id*. "It is the burden of the party seeking to set aside the Commission's order to prove by clear and satisfactory evidence that the order was unlawful or unreasonable." *Id*. (citing §386.430). "This standard of review is applicable to all points on appeal." *Id*.

## Point I

In their first point on appeal, the Agriculture Associations argue the Commission erred in granting Grain Belt's application for the Certificate. They state that the Commission's order was unreasonable because the Commission relied on testimony from Valuation Expert to establish the existence of the first and fourth Tartan factors after unlawfully prohibiting the Agriculture Associations from cross examining Valuation Expert as required by Missouri law.

8

Valuation Expert is an energy analyst for a consulting group. He testified for Grain Belt. Valuation Expert's pre-filed testimony included a report that examined how the expanded project could affect power costs and pollution reduction as compared to the status quo. The consulting group used assumptions input into a computer model. Those variables included future electricity demand, retirement and construction of power plants, and fluctuations in the price of coal and natural gas. The consulting firm projected results through 2066. The consulting firm considered two scenarios: (1) a scenario with a Grain Belt expanded transmission line capable of delivering 2500 megawatts into Missouri (the expanded project at issue in this case) and (2) a status quo scenario where the Grain Belt transmission line delivered 500 megawatts into Missouri (as approved in the 2019 Certificate). All other resource planning assumptions were held constant between the two scenarios to isolate market dynamics that could be attributed solely to the expanded transmission line. Valuation Expert summarized the results of his analysis and conclusions as follows:

> My conclusion is that the Expanded GBX Case Configuration will collectively lower energy and capacity costs in Missouri by approximately six-point-one percent (6.1%) over the 2027-2066 period, resulting in over $17.6 billion of savings for Missouri residents, on an undiscounted basis. Further, the Project is projected to reduce emissions of $CO_2$, $SO_2$, and NOx in Missouri by 9.3%, 19.2%, and 17.2%, respectively, enhancing local utilities' abilities to meet their climate and reliability goals while also delivering immediate local air quality and health benefits. Quantifying these emission reduction benefits to the State, the Expanded GBX Case Configuration could offer Missouri over $7.6 billion in social benefits from 2027-66, in addition to the over $17.6 billion in direct ratepayer savings in the energy and capacity costs over this same period—bringing the total cumulative benefit to over $25.3 billion by 2066.

9

One of the assumptions used by the consulting firm was a national carbon pricing regime implemented in 2026. Valuation Expert testified in footnote 4:

> For the purposes of the analysis, [the consulting group] assumed that a national carbon pricing regime would be implemented in 2026. The carbon price is set at $24.55/short ton in 2026 (nominal dollars) and increases at 2.2% per year, tracking inflation throughout the study period. These assumptions are broadly representative of values commonly utilized in utility resource planning and regulatory processes in the region. The use of an alternative carbon price assumption (either higher or lower) will still result in directionally consistent outcomes (i.e., ratepayer savings), albeit with differences in specific benefits values. The assumption of a carbon pricing regime is a relatively common practice in utility (e.g., Ameren in their IRP) and ISO (e.g., MISO in their LRTP) planning processes. Carbon pricing can be reflected as a broad 'shadow cost' within fundamental market models to analyze varying regulatory outcomes, and the use as a modeling variable is not necessarily tied to/dependent on a single legislative outcome at the federal or state level.

The above written pre-filed testimony given by Valuation Expert was admitted during the June 2023 evidentiary hearing. Multiple parties cross-examined Valuation Expert. The following occurred when Missouri Landowners Alliance, a party not involved in this appeal, cross-examined him:

> Q. Page 7, footnote 4 you discuss a carbon tax; is that correct?
>
> A. We refer to it as a carbon price, but I'll accept that what do you call it.
>
> Q. Carbon tax?
>
> A. Yeah.
> …
> Q. Isn't it true that adding a carbon tax to fossil generation increased the cost of natural gas consumption in your model -- excuse me -- natural gas generation?

A. Certainly carbon pricing increases the cost for thermal fossil generators operating if they have to pay for their carbon emissions, correct.

Q. And increasing the cost of natural gas generation has the effect of increasing the savings you attribute to the Grain Belt Project; isn't that correct?

A. I would disagree with that statement.

Q. It does not increase? It increases the cost of fossil generation, right?

A. It does increase the cost for a fossil generator to generate, yes.

Q. And what are you saying the impact would be on the savings to the Grain Belt Project?

A. Well, I think you're asking a multi-part question, which I'm happy to try to answer if you'd like. You were talking about a single world where you have a carbon price added to a generator. I agree that in that case or in any case with carbon or any case where you put in a higher cost to generate, that will increase the cost for that generator to operate. The impact of that will be to generally impact power prices in an upward direction. In terms of the savings however that the line induces, you really have to look at what is happening in the status quo case versus the expanded case. So really it's the subtracting the results from the expanded case from the status quo case. In both of those worlds, we made the same exact carbon assumption, we made the same exact commodity price assumption, the same exact load growth assumption, retirement assumptions, renewable build-out assumptions, et cetera. So in both cases you had the same impact of carbon if you will. So choosing carbon doesn't have an impact on increasing or decreasing the savings of the line one way or the other.

Q. Is there a carbon tax in effect today?

A. Not at the federal level. There are regional carbon taxes in the U.S.

Q. Is there in the state of Missouri?

A. Not that I'm aware of, no.

Q. Are you generally familiar with the recently enacted Inflation Reduction Act?

A. Yes, sir.
…
Q. But the act made no mention at all of imposing a carbon tax, did it?

A. It did not. However, what it did do is it introduced several new tax incentives for renewable development which were not considered in this analysis.
…
Q. And there's no sign from Congress that it's likely to enact a carbon tax in the near future, is there, to your knowledge?

A. I think that's a bit myopic. So Congress, I agree, there's not going to be a carbon tax, a cap and trade program put through Congress. However, the U.S. Environmental Protection Agency is currently looking at other ways to reduce carbon. So future rules certainly could be various cap and trade type programs to limit carbon emissions.

Q. Have they issued any formal rulemaking in that?

A. There was the clean power plan which honestly don't remember where that is currently in the courts. It was I think overturned and then potentially reinstated. I don't remember where it is right now. I believe the administration effectively decided that they would move on and try a different approach because I believe now the Supreme Court said that the EPA and the clean power plant went too broad ….

Q. That's sometimes what happens to EPA proposed rules, they just go away?

A. That's what happens to a lot of regulations. They get in purgatory for a while.
 …
Q. Are you aware of any formal proposals for Missouri state agencies to implement a carbon tax on fossil generation?

A. I'm not aware of any discussions that are ongoing right now.

Q. Is it correct that you could have modeled the two Grain Belt scenarios without adding in the carbon tax?

A. Hypothetically, yes, I could have done that.

Q. You chose not to?

A. Yes, but the reason was for several reasons. But one of the reasons if you look at that further footnote that we've been discussing on page 7 of my testimony, when you look at utilities in the region including Ameren, as they're looking at their future generation fleet they are looking at what a carbon-constrained world looks like and oftentimes when they do that modeling, when they put out what's called their integrated resource plan, they will put in a carbon shadow price to effectively hedge their risk about the potential for a future whether it's a carbon price or direct regulational carbon emissions to ensure that ratepayers are not unduly harmed if such a scenario like that happens. So you know, the reason that we did do it was to be broadly consistent with the resource planning activities that these entities do given they are going to be many of the same entities that Invenergy will be going after with those contracts.

Q. Could you please direct your attention to page 7 of your direct testimony, in particular footnote 4? … You indicate there that in your analysis you introduced a carbon tax beginning in the year 2026 in the amount of $24.55/short ton of carbon; is that correct?

A. That is what it says, correct.

Q. And you escalate that figure over a four-year period at an annual rate of 2.2 percent?

A. Yes, which is our long-term assumption for annual inflation.
…
Q. You don't really know that there will be a carbon tax in the amount of $25.09 in the year 2027, do you?
…
A. I don't think anyone is 100 percent sure of the future. So I can't be 100 percent certain that that will be the price in 2027.

Q. So you don't know?

13

A. I think as I just said no one is certain of the future. So I can't say definitively one way or the other.

Q. So it's not a known number at this point?

A. I think as I just said, it's the future is unknown.

Q. Is the same true for all of the other carbon tax figures you use in your 40-year study that we don't know for sure what those numbers will be?

A. Any analysis that one undertakes, whether it's for this proceeding or, you know, the multiple financings that I work on during a year, et cetera, are based on assumptions regarding the future about your best guess about what's going to happen. So any analysis is based off of its assumptions and the rationale behind them, but that's not unusual to this proceeding. Experts everywhere have to make assumptions whether they're in the energy space or otherwise about what they think may happen in the future to help try to understand what the value is of a project for ratepayers whether it's here in Missouri or elsewhere across the country.
…
Q. In fact, you don't know whether there will be a carbon tax at all in 2027, do you?

A. As I mentioned, the future is the future. I can't say for certain one way or the other.

Q. As of today, even if we assume a carbon tax is implemented at some point in the future, there's no way you can measure today what the amount of that tax would be at any point in the future, is there?

A. Again, I think as I mentioned, the future is unknown so I can't say with 100 percent certainty what a carbon tax will be, whether it's tomorrow or 40 years in the future.
…
Q. So at this point the carbon tax figures that you added to your analysis are neither known nor measureable, are they?

MR. SCHULTE: This is probably the twentieth question that is with regard to the future of carbon taxes and the witness has answered that they are not certain because it's the future. I think we can move on.

14

JUDGE DIPPELL: I agree. I think we understand your point, Mr. Agathen, and I think the witness's testimony says that these are assumptions so.

MR. AGATHEN: Okay, Judge.

The following occurred when the Agricultural Associations cross-examined Valuation

Expert:

Q. So I want to go back just quickly. I know you worked it over pretty hard yesterday. The assumption about carbon tax, you had an assumption built in that there would be carbon taxes from 2027 going forward, correct?

A. That was the assumption we made, correct.

Q. I guess why did you make that assumption?

A. Yeah, I think as I noted yesterday but I probably didn't explain very well. So apologies. When you look at resource planning for utilities across the U.S. but I just want to focus on the Midwest here, so we're talking about folks like Ameren or Evergy or AEP or Duke or any of them, they do a series of analyses when they look on a go-forward basis with regard to what will be in the best interest of ratepayers, what will be the most prudent risk adjusted decisions they can make when deciding what sort of resources that they're going to put on the system that, you know, ratepayers will have to pay for the next 30, 40 plus years. So when they do those analyses, the vast majority of utilities in the region assume a carbon price, or what they call a carbon shadow price, when they're doing these analyses. Now, does that mean that they assume that the federal government is going to come out with a carbon tax or a federal cap and trade program in the future, not necessarily. What they're trying to do is say we believe that we're living in a carbon constrained future and in the future there will be restrictions on the amount of carbon that we can emit.

Q. I'm sorry. I don't want to interrupt you. Let me stop you there because I've got a question about how you're tying it together. For those utilities, they're buyers – ... I'm asking about this is a company that's going to generate power and it's built into the assumption. We've now heard about three minutes of testimony about buyers of energy which I understand why they would build that into a conservative estimate, but here that number has

15

benefited the Company because the assumption includes more profitability. So that's really what's relevant to the testimony we're asking here. I don't really care what Duke does. I care about the seller. So I don't think it's a responsive answer at this point even to the question I asked relative to the analysis he's done for you. … I understand why modeling for a buyer might include a conservative estimate that says hey, in the future we think we're going to have a carbon tax, that's going to hurt our profitability or we're going to have to find alternate sources. Here though as a seller why would you build that assumption in because, correct me if I'm wrong, but by your analysis that actually increases the profitability of this project because it's going to push buyers to have to buy renewables, correct?

A. No, I disagree with that.

Q. Okay. Tell me why.

A. Okay. Let me rewind. The point of our analysis is to – it's not to take a view from the seller's point of view or the buyer's point of view. What we're trying to do here is effectively look at it as any prudent person would do, as any, from a prudency basis, how should someone think about the future in a carbon constrained world. As I was saying, and I'll take ten seconds to finish this, when utilities look at their choices, which we're trying to put it in the shoes of how they're going to think about whether they want to purchase from the line or not, we're trying to adopt assumptions that they would assume within their internal analysis. So I'll stop there.

Q. Okay. But the converse of that would be, though?

A. Yeah, which I was going to get to.

Q. Okay.

A. Now, does including a carbon assumption, does that create a, quote, unquote, better environment for the seller, which again using your words, not mine, the answer is no, because what we're doing again as I explained yesterday, we're doing what we call a with and without analysis, sometimes people call it a factual, counter factual analysis or a one-factor analysis. So what that means is we're including a world that has all of the assumptions we talked about, including carbon, so that's the world. The only difference that we make between world one that doesn't have the transmission line

16

and world two that has a transmission line is putting the transmission line there. So that world that doesn't have the transmission line has carbon. There's carbon in the world with the line. We're just subtracting the two. So we're not creating a world where all of a sudden this line goes into service and now there's magically a carbon price and that increases the savings that utilities can have. That carbon constrained future in the way that we model it is both worlds. So when you're doing the math and you're subtracting those, you basically are subtracting the same carbon impact from both cases.

Q. Is it neutral to your analysis then whether you include that assumption or not?

A. It's not neutral but it's not binary.

Q. Then which way does it cut? Here's the reason I'm asking. If it doesn't matter if it truly just zeroes out in the math, then it doesn't really matter if you include the assumption, right, but I think you just said that it does matter if you include the assumption. So why is it there?

A. It's a complicated question. And I know you want me to be quick. So I'll try to be quick here. One of the impacts by including a carbon assumption, again in both worlds, is that it makes it more challenging for fossil generators to operate and induces more renewables to enter the system. Again, we're not even talking about the lines. It makes renewables more economic. So what does that do. Renewables in and of themselves, which again I think was consistent from one of the Staff witnesses, is that as you include more renewables in the supply stack, all else equal you're reducing power prices. So we're actually creating in some ways a more conservative power price outcome by including more renewables in our analysis than would otherwise be there without that carbon assumption.

So again, to answer your question, I can't say definitively which way it would move because yes, from a single -- if we remove carbon, all else equal would power prices be lower, yes, they'd be lower in both cases, but the counter to that is we also would build a lot loss renewables. So because of that power prices would go up. So where is it? It's somewhere in the middle. I don't know where it is because I haven't done the analysis. It's not an easy 101 one-for-one analysis to do.

Q. I want to talk about the basis of the assumptions starting in 2027. That would lie in the next presidential cycle, correct?

17

A.  Sure, I'll accept that.

…
Q.  The 2027 carbon tax and all the carbon tax going forward that you have built into your assumptions, are you assuming that would be a federally imposed regime, a globally imposed regime, a state level regime?  What is the assumption there generally built around?

A.  Yeah, and again I want to move this forward as well.  It's not based on, I'm making really no assumption there.  I think what -- So there are many ways that it could happen.  I'll explain that briefly.  Certainly one way as you point out would be from a Congressional initiative with the president signing that into law.  I would agree, and this has been my view for a long time, that it's next to impossible to get anything done in Congress these days, so the likelihood of having a federal carbon program move through Congress is limited.  However, there are other avenues by which it can happen.  The most reasonable one that one would think through is the U.S. Environmental Protection Agency is also continuing to move through different avenues to control carbon prices -- or carbon emissions, excuse me.  I think as we all know, there have been fits and starts to that probably starting with the Obama administration.  But again, the Environmental Protection Agency has moved forward with preliminary plans for ways to limit carbon emissions.  ….  In addition to that, you could certainly have state level or regional programs, but again I'm not taking a specific view on the likelihood of those happening.

Q.  Do you know of any such proposed plan in Missouri to have a Missouri level carbon tax?

A.  I am not aware of any.

Q.  Do you know of any such proposed program in Kansas?

A.  I'm not aware, no.

Q.  Do you have any reason to believe that the passage of such a program is likely in either of those states between now and 2027?

A.  As I said yesterday, the future is unknown, but I'm unaware of anything currently moving through the legislatures in those states that would be moving in that direction.

18

Q. Do you know of any such proposed program in Indiana or Illinois at this point?

A. Yeah. Illinois, last year they passed the Climate and Equitable Jobs Act, …. And that was passed by their legislature and signed into law by Governor Pritzker, whereas that is severely limiting carbon emissions starting in -- well, the first – it's already started but the major regulation goes into effect starting in 2030, which will require the shutdown of most of the natural gas-fired fleet within the state at that time frame.

Q. Okay. That's 2030, not 2027, correct?

A. Well, not exactly. All of the natural gas-fired facilities within the state as of the beginning of this year have to limit their operations based off of historical operations and then those get further limited in 2030.
…
Q. I'm sorry. Indiana. Sorry. Next state over.

A. I am not aware of anything in Indiana.

Q. Okay. Your assumptions -- You talked about the Illinois program. Is the assumption you've built in, is it just for the Illinois program or would it be for a broader cap and trade regime?

A. It would be for a carbon regime that covers all generators within the U.S.

Q. Okay. And so this is what I'm asking, because obviously a model is built on the strength of its assumptions in part, correct; you would agree with that?

A. Yeah, it is built on assumptions, correct.

Q. Okay. If we build a model on me making my old high school wrestling weight, it's not going to happen. That would not be a good assumption I can tell you. That's what I'm trying to get to the bottom of. 2027 frankly seems aggressive as an assumption for us to have a cap and trade program in place nationally. Even if EPA did it, that would be litigated almost certainly, correct?

19

A.  More than likely.

Q.  It probably wouldn't be litigated to fruition by -- or to completion by 2027, would it?

A.  I'm not a lawyer, but yeah, it's unlikely it would.
…
Q.  But you would stand today on the assumption in the model that there would be a cap and trade system that would dynamically affect your overall conclusion by 2027?

MR. SCHULTE:  Objection.  It misstates the previous testimony as we've been over many times.  The testimony does not -- the model does not assume specific federal action in order to assume a carbon constrained future.

MR. HADEN:  I didn't say I assumed federal action.  I said it assumes a cap and trade carbon program, I believe, but that's what I'm asking about.

MR. SCHULTE:  Again, it still misstates the evidence because the testimony which we've been over many times is that it does not assume specific government action federal or state.

MR. HADEN:  Okay.  But it does assume, I think he said multiple times, a carbon tax program being in place from 2027 forward and he said that does make a difference in the model.  He may not know exactly where the number is, but that's what I'm trying to get to the bottom of.  I don't understand why there's such a push.  You're going to present an expert and then try to constrain his testimony only to what you want to hear. It's a fair question as to how that affects the model.  If we're to believe the model, he should be able to explain the model.  I'm not saying [Valuation Expert] is not.  But I don't understand the objection, and I don't think it misstates his testimony, but more importantly I think I'm asking as it relates to his conclusion in a way that's fair to the overall inquiry for the expert witness. That's what he's here for.
…
JUDGE DIPPELL:  Objection sustained.  I believe the question asks for facts that the witness has testified don't exist.  He has not testified that he assumed a carbon tax.

MR. HADEN: Judge, I respectfully disagree. If I could ask to clarify then his testimony on that matter to see if we can come back to this. We may get an asked and answered objection. My understanding what he testified to earlier is -- well, and I can ask him again but I don't think that's what he said in his earlier testimony about the way that assumption -- because it's not that the assumption is neutral, have it in and have it out. It's not that it's completely transparent to the rest of the conclusion. He said that himself earlier that you subtract it out but there is movement, he doesn't know the exact number, but there is a difference between having it in and having it out.

MR. SCHULTE: Judge, if I may.

JUDGE DIPPELL: One last.

MR. SCHULTE: Mr. Haden is testifying about what this witness testified about.

MR. HADEN: Then we can go back and read the record. I'm fine with that, but I don't want to slow it down that much.

JUDGE DIPPELL: Mr. Haden.

MR. HADEN: I don't think I am.

JUDGE DIPPELL: Mr. Haden --

MR. HADEN: Yes, Judge.

JUDGE DIPPELL: -- let Mr. Schulte finish.

MR. HADEN: Yes.

MR. SCHULTE: This is a good example, Judge Dippell, of why we have prefiled testimony in complicated technically intense areas and we could simply go back and read footnote 4 on page 7 of [Valuation Expert's] testimony where he explains this very clearly. And I don't know if Mr. Haden did not read that or if he has questions specific to that statement in his testimony, but I think that would help us and the Commission clarify exactly what [Valuation Expert's] testimony is.

21

MR. HADEN:  Judge, active cross-examination is here in part because a witness might have an inconsistent answer, they may roll back on an answer.  In all sorts of judicial proceedings, people say X in direct testimony and then come back and say well, Y, in cross-examination or they qualify their answer.

MR. SCHULTE:  A study is a fixed final study.

MR. HADEN:  It's about procedure.

JUDGE DIPPELL:  Okay.  Stop.  Stop.  I've already ruled on the objection.  Move on with your next question.

MR. HADEN:  Judge, I will move on.

JUDGE DIPPELL:  Do not argue with me.

MR. HADEN:  I have a question then on clarification then.  I'm not to go back to ask about anything he's talked about earlier then in terms of the analysis?  I'm not going to ask the same question again.  I'm unclear now as to what his testimony is about how it applies.

JUDGE DIPPELL:  We talked for a long time yesterday about a carbon tax.  The witness testified, the witness has prefiled testimony.  I don't know how much more we need to testify about whether there's going to be, whether there was or whether there's assumptions about an official carbon tax.

MR. HADEN:  And Judge, not argumentatively then, you know I have to do my job just making a record then, I just put a place in the record.  I mean, I am objecting on an ongoing basis in not being able to adequately cross-examine this witness based on the ruling.  I'll put that on the record.  I'm not arguing.  You understand where I'm at on that.  I'll move on.

JUDGE DIPPELL:  Go ahead.

MR. HADEN:  Thank you.  I have.  I just wanted to make a statement there so I've got that.

The Agricultural Associations then cross-examined Valuation Expert for five more

transcript pages about topics other than an assumed carbon tax.  Two other parties and the

Regulatory Law Judge subsequently questioned Valuation Expert about a carbon tax and footnote 4. Grain Belt also questioned Valuation Expert about it on redirect.

The Commission stated the following in Paragraphs 64 and 68 of the Report and Order:

> 64. The [consulting group's] Report and [Valuation Expert's] conclusion is that expanding the Original Project to the Project will lower energy and capacity costs in Missouri by approximately 6.1% over the 2027-2066 period, resulting in over $17.6 billion of savings for Missouri residents, on an undiscounted basis. The [consulting group's] Report also found that the Project is projected to reduce emissions of $CO_2$, $SO_2$, and $NO_x$ in Missouri by 9.3%, 19.2%, and 17.2%, respectively, enhancing local utilities' abilities to meet their climate and reliability goals, while also delivering immediate local air quality and health benefits. Quantifying these emission reduction benefits to the state, [Valuation Expert's] conclusion was that the Project could offer Missouri over $7.6 billion in social benefits from 2027-66, in addition to the over $17.6 billion in direct ratepayer savings in the energy and capacity costs over this same period – bringing the total cumulative benefit to over $25.3 billion by 2066.

> 68. The Project is needed because it will result in $17.6 billion in savings to Missouri ratepayers and $7.6 billion in social benefits, compared to the projected $5.7 billion cost of the Project.

These statements were made as findings of fact by the Commission in reliance on Valuation Expert's testimony.

On appeal, the Agricultural Associations argue that the Commission's order is unreasonable because it relied on Valuation Expert's testimony after limiting their ability to cross-examine him. First, we must deal with the argument made by all three Respondents that this argument has not been preserved for appellate review. Specifically,

the parties note that the Agricultural Associations did not make an offer of proof or move to strike Valuation Expert's testimony.

"Generally, appellate courts will not review excluded evidence without a specific and definite offer of proof." *Frank v. Envtl. Sanitation Mgt., Inc.*, 687 S.W.2d 876, 883 (Mo. banc 1985). "[T]he purpose of an offer of proof is to insure the trial court and opposing counsel understand the proposed evidence." *Id*. "Additionally, an offer of proof enables appellate courts to understand claims of error." *Id*. The Missouri Supreme Court "created an exception to the rule requiring offers of proof." *Id*. "This exception is very narrow." *Id*. "First, it requires a complete understanding, based on the record, of the excluded testimony." *Id*. "Second, the objection must be to a category of evidence rather than to specific testimony." *Id*. "Third, the record must reveal the evidence would have helped its proponent." *Id*. at 884.

"A party is not required to make an offer of proof if it is obvious that the offer would have been futile." *Hyde v. Butsch*, 861 S.W.2d 819, 821 (Mo. App. E.D. 1993); *see also B.J.D. v. L.A.D.*, 23 S.W.3d 793, 797 (Mo. App. E.D. 2000) (offer of proof not required where "the Commissioner made it clear that he did not propose to sit beyond five o'clock, and the post-hearing motion informed the Commissioner about what counsel was trying to develop with the witness"); *Hyde v. Butsch*, 861 S.W.2d 819, 821 (Mo. App. E.D. 1993) (offer of proof not required where "it is apparent from the record that an offer

24

of proof would not have affected the trial court's decision to terminate plaintiff's cross-examination.").[3]

"[W]here relevance is clear, offers of proof are not generally required when the party seeks evidence through cross-examination." *State v. Williams*, 724 S.W.2d 652, 656 (Mo. App. E.D. 1986). "An offer of proof is required of a party who knows what the witness will say if the question is permitted." *Id*. "This seldom applies to cross-examination." *Id*.; *see also Loyd v. Cooper*, 899 S.W.2d 907, 909 (Mo. App. S.D. 1995) (offer of proof "is not ordinarily required during cross-examination, as counsel will often not have prior information sufficient to know what answer may be given").

As shown in the extensive transcript excerpts set forth above, an offer of proof was not necessary to make sure the trial court and opposing counsel understood the proposed evidence or to allow this court to understand the claim of error. *See, e.g., State v. Johnson*, 690 S.W.3d 928, 930 n.3 (Mo. App. E.D. 2024) ("The hearing transcript, which contains nearly ten pages of argument between the State and Johnson on this particular

---

[3] Written offers of proof suffer none of the concerns about oral offers addressed by the statute—even if a matter ultimately is deemed wholly irrelevant, or even if it is presented in a format that the presiding officer considers unduly long or repetitious of other testimony, or if it is deemed privileged, it can be placed in the written record without delaying or disrupting the trial proceeding, so that on review the appellate court can determine for itself whether it agrees with the presiding officer's assessment.

*State ex rel. Praxair, Inc. v. Missouri Pub. Serv. Commn.*, 344 S.W.3d 178, 185 (Mo. banc 2011) (referencing section 536.070.7 of the Missouri Administrative Procedure Act which is substantively identical to 4 C.S.R. 240–2.130(3)).

25

issue, demonstrates that all parties were alerted to, and the trial court was able to directly rule on, the matter, thereby sufficiently preserving it for appeal."). A motion to strike is not required where the issue is the probative value of testimony as opposed to the admissibility of testimony. *Abbott v. Haga*, 77 S.W.3d 728, 732 (Mo. App. S.D. 2002). We find that the Agricultural Associations preserved this claim of error.

The Commission's authority and the procedures it follows are set out in Chapter 386. Section 386.410.1 states that "[a]ll hearings before the commission or a commissioner shall be governed by rules to be adopted and prescribed by the commission." 20 C.S.R. 4240-2.130, adopted by the Commission, states in relevant part:

> (1) In any hearing, these rules supplement section 536.070, RSMo.
> …
> (3) The presiding officer shall rule on the admissibility of all evidence. Evidence to which an objection is sustained, at the request of the party seeking to introduce the same or at the instance of the commission, nevertheless may be heard and preserved in the record, together with any cross-examination with respect to the evidence and any rebuttal of the evidence, unless it is wholly irrelevant, repetitious, privileged or unduly long. When objections are made to the admission or exclusion of evidence, the grounds relied upon shall be stated briefly. Formal exceptions to rulings shall be unnecessary and need not be taken.

Section 536.070 states in relevant part:

> In any contested case:
> …
> (2) Each party shall have the right to call and examine witnesses, to introduce exhibits, to cross-examine opposing witnesses on any matter relevant to the issues even though that matter was not the subject of the direct examination, to impeach any witness regardless of which party first called him or her to testify, and to rebut the evidence against him or her;
> …

26

(7) Evidence to which an objection is sustained shall, at the request of the party seeking to introduce the same, or at the instance of the agency, nevertheless be heard and preserved in the record, together with any cross-examination with respect thereto and any rebuttal thereof, unless it is wholly irrelevant, repetitious, privileged, or unduly long.

(8) Any evidence received without objection which has probative value shall be considered by the agency along with the other evidence in the case. The rules of privilege shall be effective to the same extent that they are now or may hereafter be in civil actions. Irrelevant and unduly repetitious evidence shall be excluded;
…

"[U]nless the evidence is found to be wholly irrelevant, repetitious, privileged or unduly long, it must 'be heard and preserved in the record, together with any cross-examination with respect thereto and any rebuttal thereof.'" *State ex rel. Praxair, Inc. v. Missouri Pub. Serv. Commn.*, 344 S.W.3d 178, 185 (Mo. banc 2011) (quoting section 536.070(7) and 4 C.S.R. 240–2.130(3) which was moved to 20 C.S.R. 4240-2.130(3) on August 28, 2019).

"[A]dministrative hearing officers in contested cases have wide discretion in determining the scope of cross-examination." *Lagud v. Kansas City Bd. of Police Com'rs*, 136 S.W.3d 786, 793 (Mo. banc 2004) (internal quotation marks omitted). However, "this discretion does not extend to excluding testimony on relevant and material issues sought to be evoked on cross-examination." *Id*. (in the context of a blanket restriction). "It has long been the rule in Missouri that on cross-examination a witness may be asked any questions which tend to test his accuracy, veracity or credibility or to shake his credit by injuring his character." *Id*. (internal quotation marks omitted).

The Agricultural Associations focus on the Regulatory Law Judge's statement, "Objection sustained. I believe the question asks for facts that the witness has testified don't exist. He has not testified that he assumed a carbon tax." While they point to where Valuation Expert testified about such an assumption, they ignore where Valuation Expert initially called it a carbon price and stated he would accept calling it a carbon tax. They also ignore the numerous times that Valuation Expert testified that he did not assume a legislatively or otherwise legally imposed carbon tax, could not predict what future regulations might be implemented, and was not relying on "a single legislative outcome at the federal or state level."

"The Commission has broad discretion in evidentiary determinations." *Matter of Rate Increase Req. for Liberty Utilities (Missouri Water), LLC*, 592 S.W.3d 82, 94 (Mo. App. W.D. 2019). When the Regulatory Law Judge stated that Valuation Expert had not testified he assumed a carbon tax, she was referring to a legal carbon tax as opposed to a more general carbon price. The Regulatory Law Judge stated that she did not "know how much more we need to testify about whether there's going to be, whether there was or whether there's assumptions about an *official* carbon tax." Given her focus on an "official carbon tax" and the discretion given to the Commission, we do not find error in the Regulatory Law Judge's statement.

The Agricultural Associations also complain that they were not permitted to further cross-examine Valuation Expert about the carbon price assumptions built into his analysis. In their Reply Brief, the Agricultural Associations argued "it was clearly

evident what [Valuation Expert's] testimony was going to be if he was allowed to testify." They state the following:

> At the evidentiary hearing in this matter, Appellants' counsel argued to Judge Dippell and opposing counsel the scope of cross-examination that he intended to elicit. Specifically, Appellants' counsel sought to cross-examine [Valuation Expert] regarding an assumption of the future existence of a national carbon tax and the impact of that assumption on his conclusions regarding the Grain Belt Project.

The Agricultural Associations argue that their cross examination, if permitted to continue, would have gone to the probative value of Valuation Expert's testimony and whether there was reasonable certainty for his expert testimony. They argue in their Appellants Brief that "the question of whether or not [Valuation Expert's] work is accurate, whether the underlying assumptions are sound, and whether his conclusions would change if such assumptions were untrue necessarily matter to the outcome of this case." The Agricultural Associations argue:

> However, the Commission was deprived of the ultimate answer to these questions by Judge Dippell's entirely erroneous ruling that "[Valuation Expert] has not testified that he assumed a carbon tax," and by Judge Dippell's further statement that "I don't know how much more we need to testify about whether there's going to be, whether there was or whether there's assumptions about an official carbon tax."

As set forth in the lengthy excerpts above, Valuation Expert was questioned extensively about an assumed carbon price, the argument that the carbon price was actually a carbon tax, and whether a carbon tax exists or will exist in the future. He testified at length about why he included the carbon price with respect to standards in his

industry. He also testified at length about the impact of that assumption on his conclusions.

Section 536.070(2) gives parties in a contested case the right to cross-examine witnesses. Section 536.070(8) provides that "unduly repetitious evidence *shall* be excluded." (emphasis added). "This court has found [in the specific context of the Public Service Commission hearings], pursuant to these statutory provisions, that the Commission is not required to hear evidence that is irrelevant and repetitious." *State Ex rel. Praxair, Inc. v. Pub. Serv. Commn. of the State of Missouri*, 328 S.W.3d 329, 336 (Mo. App. W.D. 2010) (internal quotation marks omitted). The Regulatory Law Judge's statement that she did not know how much more Valuation Expert needed to testify about the assumed carbon price recognized the repetitious nature of his testimony. Again, given the discretion afforded to this decision, we do not find error.

The Agricultural Associations argue that the Commission's order is unreasonable because it relied on Valuation Expert's testimony without allowing them to cross-examine him. They ask this court to remand this matter to the Commission for rehearing to allow proper examination of Valuation Expert. We find that the Regulatory Law Judge did not err in restricting the scope of cross-examination. The point is denied.

## Point II

In their second point on appeal, the Agriculture Associations argue the Commission erred in denying their application for rehearing. They state that the Commission's order was unreasonable because Commission relied on testimony from

30

witness Valuation Expert to establish the existence of the first and fourth Tartan factors after unlawfully prohibiting the Agriculture Associations from cross examining Valuation Expert as required by Missouri law.

The Agricultural Association's argument in Point II is premised on this court finding merit with their argument in Point I.  Because we find no error in Point I, we need not consider Point II.  The point is denied.

**Point III**

In their third point on appeal, the Agriculture Associations argue the Commission erred in granting Grain Belt's application for the Certificate.  They state that the Commission's findings of facts regarding the Project's purported job creation was unreasonable because such findings of facts contradict and ignore the testimony of Grain Belt's own expert witness, Public Benefit Expert.

Public Benefit Expert runs an economic research firm.  He testified on behalf of Grain Belt about the estimated direct, indirect, and induced impact on job creation, wages, total economic output, and anticipated government revenues associated with the expanded transmission line in Missouri.

In his pre-filed testimony, Public Benefit Expert stated:

The construction job figures are significant, totaling 247 for Audrain County, 318 for Buchanan County, 243 for Caldwell County, 66 for Callaway County, 303 for Carroll County, 362 for Chariton County, 226 for Clinton County, 804 for Monroe County, 356 for Ralls County, and 284 for Randolph County.  The statewide construction job figure for Missouri is estimated at 5,747.  In addition to the jobs during construction, the Project will also support permanent positions.  The long-term jobs supported are

31

estimated to be 10.6 for Audrain County, 3.8 for Buchanan County, 1.9 for Caldwell County, .3 for Callaway County, 3.2 for Carroll County, 4.1 for Chariton County, 1.4 for Clinton County, 16.2 for Monroe County, 2.0 for Ralls County, and 2.6 for Randolph County. The total long-term Project related job figure for Missouri is 104.4.

…

The total earning impact from the Project for Missouri is $586,118,331 for construction and $8,113,077 for operations.

When cross-examined by the Missouri Landowners Alliance, Public Benefit

Expert stated the following:

Q. Looking at line 3, is it correct that using the IMPLAN model you estimated that for the three-year construction period of the Project it would produce the full-time equivalent of about 5,747 new construction jobs in Missouri?

A. It would create or support that number of jobs, yes.

Q. That's the total for all three years?

A. That's correct.

Q. And at line 11 of that same page, you state that the total earnings impact from these construction jobs would be just over 586 million in Missouri; is that correct?

A. That's correct.

Q. And that's also a total for three years, correct?

A. Yes.

When cross-examined by the Agricultural Associations, Public Benefit Expert stated the

following:

Q. Based on your assumptions, I think what it's saying is that you're projecting that it will create 100 jobs over three years in Audrain County, correct?

A. 100 jobs over, yes, the three-year period.

Q. And just so I'm clear then in the real world does that mean that there might be 20 the first year, 50 the second year and 30 more the last year? Is that how you do -- How do you get to 100? It's not 100 people working all at once, correct?

A. That's correct. It's full-time equivalents, FTEs. So you can normalize for part-time workers.

Q. Right.

A. And these are short-term effects because it's only during construction.

Q. So annualized, assuming you had even distribution of the number, which I know you may not in the real world, assuming you did, that's really 33-1/3 jobs in any given year?

A. That's correct.

Q. It's not 100 jobs all at once?

A. Yes.

Q. The one reason I ask is high school there has about 200 kids. So if you took every, let's just say every able bodied male, it wouldn't be in the modern world, but just for the sake of being half, they're not all going to step out of high school and theoretically, I mean, it wouldn't be the same way, but let's say that's the workforce you needed. They wouldn't all step out and have a job the day they graduated. It would be 33-1/3 of them would have a job?

A. That's correct.

Q. When you talk about that being local, what do you mean by local? It means literally it's going to be people that live in the county?

A. That was our assumption that they would be hired locally along the construction route.

Q. And that's the assumption in each of these counties then?

A. That's correct.

Q. They're going to use a local crew in every one of these counties to build the tower is the assumption?

A. Yes.

Q. Is there any reason to believe that's actually how they'll do it?

A. The work will be done in that county. The question of who does that work within that county, it could be that they hire, you know, local contractors but that's going to be up to the local practices of the company that's actually doing the construction.

Q. Okay. But this makes a big difference, doesn't it make a big difference in the underlying economy of the county as to whether they actually hire a local team of people that live there versus have the work done and then they leave? Does that make a difference in your analysis?

A. That will make a difference.
…
Q. Right. So they could just as easily for what you know use completely out-of-state labor to come in and do this, right?

A. That was not what I was told that they were going to do when I made the assumptions for the model.

Q. That's fair. What did they tell you they were going to do?

A. That they would hire local.

Q. That was the assumption they had you working on?

A. Yes.

Q. If that turns out to not be true, does that mean your underlying report would have less predictive power and be less accurate?

A. So that's going to affect the direct jobs because those are the effects of those construction workers and others. But you also have to remember an important part when we're talking about jobs during, this is really jobs during construction. And to simplify the analysis, this includes all of the expenditures that Invenergy makes up until the point that it's operational. Okay. *So you look at construction and you're thinking people climbing the poles. But the cost to Invenergy is going to be attorneys, local land agents that are signing up people, it's going to be, you know, financial people, accounting people, all of that is in, you know, the direct jobs so it's --*

Q. And I understand.

*A. So that 33-1/3 is not just saying oh, that's the guy pouring concrete or stringing the --*

Q. Fair enough. I understand it's a rough proxy for a lot of different jobs, blue collar, white collar, pink collar jobs, all that. I mean, this week we're really zinging the meter on the lawyer side. So at least for Cole County we're killing it. So as it ties then to -- and I understand down the chain even to indirect jobs, induced jobs, I think I understand generally what you're saying there

The Commission stated the following in Paragraph 130 of the Report and Order:

The Project advances the public interest through its impact on local economic, fiscal, and employment benefits. For example, the Project will support 5,747 *construction jobs* statewide over a three-year period and a significant number of *construction jobs* in the Missouri counties it crosses: 247 for Audrain County, 318 for Buchanan County, 243 for Caldwell County, 66 for Callaway County, 303 for Carroll County, 362 for Chariton County, 226 for Clinton County, 804 for Monroe County, 356 for Ralls County, and 284 for Randolph County. *In addition to construction jobs*, the Project will support 104.4 long-term positions statewide and long-term jobs in the Missouri counties it crosses: 10.6 for Audrain County, 3.8 for Buchanan County, 1.9 for Caldwell County, 0.3 for Callaway County, 3.2 for Carroll County, 4.1 for Chariton County, 1.4 for Clinton County, 16.2 for Monroe County, 2.0 for Ralls County, and 2.6 for Randolph County. These jobs are estimated to result in total worker earnings from the Project for Missouri of $586,118,331 during the three year construction period and $8,113,077 during the *operation phase* of the Project.

35

(Emphasis added). The Agricultural Associations now argue that this is a misstatement of Public Benefit Expert's testimony. Their argument is focused on the phrase "construction jobs" and the italicized testimony:

> *So you look at construction and you're thinking people climbing the poles. But the cost to Invenergy is going to be attorneys, local land agents that are signing up people, it's going to be, you know, financial people, accounting people, all of that is in, you know, the direct jobs so it's --*
> *…*
> *So that 33-1/3 is not just saying oh, that's the guy pouring concrete or stringing the –*

The Agricultural Associations argue that "the fact that the jobs at issue may not be actual construction jobs is significant. Public Benefit Expert's testimony gives no actual indication of how many of the jobs at issue will be actual construction jobs." They claim that the Commission's findings of fact are unreasonable because "there is in fact no indication as to how many, if any, of the jobs at issue will be actual construction jobs."

Public Benefit Expert's testimony set out above makes clear that he estimated 5,747 jobs "for the three-year construction period of the Project." He later testified that those construction jobs included more than actual construction workers. By using the phrase "construction jobs," Public Benefit Expert was referencing a period of time – namely, the three year construction period. The attorney for the Agricultural Associations acknowledged as much, stating that the phrase "construction jobs" is "a rough proxy for a lot of different jobs, blue collar, white collar, pink collar jobs, all that." This construction period of time would be followed by a period of time referenced in the record as the "operations phase."

36

"All factual findings of the Commission are presumed correct, and if substantial evidence supports either of two conflicting factual conclusions, the Court is bound by the findings of the administrative tribunal." *Matter of Empire Dist. Electric Co.*, 672 S.W.3d 868, 875 (Mo. App. W.D. 2023) (internal quotation marks omitted). The Commission's factual findings are not in conflict with Public Benefit Expert's testimony. The point is denied.

## Conclusion

The order is affirmed.

_____

Anthony Rex Gabbert, Chief Judge

All concur.